706 So.2d 904 (1998)
Carole H. PETRACCA, Appellant,
v.
Luca R. PETRACCA, Appellee.
No. 96-3603.
District Court of Appeal of Florida, Fourth District.
February 18, 1998.
*905 Norman D. Zimmerman of Zimmerman, Zimmerman & Miceli, P.A., Pompano Beach, for appellant.
Mark H. Goldberg of Hartman & Goldberg, Cooper City, for appellee.
FARMER, Judge.
The issue presented in this appeal is whether an agreement settling dissolution of marriage litigation is subject to a "fair and reasonable" determination by the trial judge under Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.1962). We hold that it is not under the facts and circumstances of this case and affirm the trial judge on that issue. There is an ambiguity in the agreement, however, and so we remand the case to the trial court for resolution of the parties' actual intent as regards the subject provision.
Because the background for an agreement is usually indispensable to an understanding of it, we begin with the history of this litigation. Represented by experienced counsel, the wife filed this petition for dissolution of marriage in June 1994. The husband appeared through his own counsel shortly thereafter. From that point on, the battle raged. In the next two years the combatants filed nearly 70 substantive motions, including four attempts to have the husband held in contempt, and one appeal.
Many of these motions were directed to discovery, including one by the wife to have her expert inspect and value land, and another by the husband seeking to have her provide handwriting exemplars. The wife's pretrial witness list (filed some eight months before the settlement) names a CPA to testify (presumably as to the husband's financial interests). The case was set for trial on five separate occasions, the last scheduled to begin little more than two weeks from the day the parties announced a settlement on the record (apparently at a deposition). Thus even in this day of overheated divorce litigation, the battle in this case was fierce.
*906 Turning to the settlement itself, the parties announced it before a court reporter whose transcribed notes are part of the record. After going through the terms of the settlement item by item, each counsel agreed on the specific provisions in the presence of the parties themselves. At that point each party's lawyer examined that party under oath to establish assent to the agreement. The wife testified as follows:
COUNSEL: And you have participated and assisted in the negotiation which led to this settlement we just placed on the record. Correct?
WIFE: Correct.
COUNSEL: You understand the settlement?
WIFE: Correct.
COUNSEL: You intend to be bound by it?
WIFE: Correct.
COUNSEL: You entered into freely you entered into it freely and voluntarily and after advice of counsel?
WIFE: Yes.
COUNSEL: You understand this is a complete and final resolution of this case?
WIFE: What has been stated so far?
COUNSEL: Yes.
WIFE: Yes.
The significance of this testimony, of course, needs no comment.
Just two weeks after the settlement her original lawyer moved for leave to withdraw, citing irreconcilable differences. Soon a new lawyer appeared on her behalf and filed a motion to invalidate the agreement. After first setting out what can be characterized only as allegations that the parties now dispute one of the settlement's terms, the wife then sets forth in great detail why her analysis of the disputed provision should be accepted.[1] Her version failing, she then appears to suggest that the whole thing should be called off. She argues that the absence of an agreement on the disputed provision can mean only the lack of an entire agreement between the parties. Her motion closes with the following:
"It must be remembered that the agreement should be subject to the approval of the Court, and if the agreement either plunges this petitioner into poverty, or leaves the parties in a position monitarily [sic] which would be completely inequitable, which is the case herein, the Court should dissaprove [sic] the agreement in its entirety!"
The motion ends with a plea ad misericordiam to let her out of the bargain or rewrite it to suit her contended version of the parties' actual intent. It is this motion that, she argues, authorizes a judge to set aside a litigation settlement agreement reached just before trial and that requires an evidentiary hearing on the motion.
Her primary emphasis is on Casto v. Casto, 508 So.2d 330 (Fla.1987). That case, she argues, empowers judges to set aside a litigation settlement agreement that makes an "unfair or unreasonable provision for the [challenging] spouse." Casto does not stand in isolation; it is only the latest in a line of cases including Belcher v. Belcher, 271 So.2d 7 (Fla.1972); Posner v. Posner, 233 So.2d 381 (Fla.1970); and Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.1962). It is impossible to understand Casto without first considering its predecessors.
The earliest case, Del Vecchio, concerned the validity of an agreement between spouses, reached before marriage, disposing of property and other rights in the event of *907 death. After the husband died, the widow sought to set aside the agreement on the grounds that it was unfair and made without a fair and full disclosure of his financial means. The supreme court held that:
"[a] valid antenuptial agreement contemplates a fair and reasonable provision therein for the wife, or, absent such provision, a full and frank disclosure to the wife, before the signing of the agreement, of the husband's worth, or, absent such disclosure, a general and approximate knowledge by her of the prospective husband's property....
"If the provision made by the agreement is not fair and reasonable then it should be made to appear that the wife, when she signed, had some understanding of her rights to be waived by the agreement. In any event she must have signed freely and voluntarily, preferably, but not necessarily a required pre-requisite, upon competent and independent advice."
143 So.2d at 20. Later in the opinion, the court expressed the following policy for its decision:

"The relationship between the parties to an antenuptial agreement is one of mutual trust and confidence. Since they do not deal at arm's length they must exercise a high degree of good faith and candor in all matters bearing upon the contract. The courts will no longer indulge the archaic presumption of dominance by the husband but they will scrutinize such agreements and will require good faith disclosure by the prospective husband of the material facts relating to the character and value of his property showing that the prospective bride possessed such general and approximate knowledge of his property as to enable her to reach an intelligent decision to enter into the agreement." [emphasis supplied]
143 So.2d at 21.
We note the narrowness of this holding. It is not that all unfair prenuptial agreements are against public policy. Instead, the court has held that only those unfair agreements reached without sufficient knowledge of assets are against public policy. The reasonableness of the disposition of property is thus important only if it was the result of assisted ignorance of financial resources. In other words a spouse could enforce a property disposition that is unfair but voluntarily made with full knowledge.
In Posner, a prenuptial agreement had purported to set the disposition of property and support in the event of divorce. The contention was that such agreements were void as against public policy because of their destructive effects on the institution of marriage. In rejecting that argument and upholding the general validity of such agreements, the Posner court stated the following:
"If such an agreement is valid when tested by the stringent rules prescribed in Del Vecchio v. Del Vecchio, supra, 143 So.2d 17, for ante- and post-nuptial agreements settling the property rights of the spouses in the estate of the other upon death, and if, in addition, it is made to appear that the divorce was prosecuted in good faith, on proper grounds, so that, under the rules applicable to postnuptial alimony and property settlement agreements referred to above, it could not be said to facilitate or promote the procurement of a divorce, then it should be held valid as to conditions existing at the time the agreement was made."
233 So.2d at 385. The import of Posner is to remove the former public policy against this kind of prenuptial agreements addressing property and support dispositions upon divorce. It also makes clear, however, that such agreements are subject to the principles of Del Vecchio.
Belcher involved a property agreement reached after marriage and also after the parties had become estranged and separated. The husband had sought to contract away his obligation to support his spouse while separated. The question was whether the husband can, by a prior lump sum payment, buy out of his obligation to pay alimony during a separation without a divorce. 271 So.2d at 10. In deciding the issue the court noted that the state is an interested party in the matter of support of a wife during marriage, and that a postnuptial contract respecting such support is subject to Florida law making the husband responsible for support during *908 marriage. 271 So.2d at 9. The court determined that the husband could not avoid his obligation to support his wife during the separation, explaining that "indeed post-nuptial settlement agreements are regularly approved upon meeting proper requirements of disclosure and fairness." 271 So.2d at 10. But, the court added, "[t]his holding does not affect the validity of the antenuptial contract in its other respects, in which it is tested under Del Vecchio and Posner." 271 So.2d at 10-11. Belcher is of course primarily concerned with the husband's obligation of support during a separation without divorce, but it also continues Del Vecchio and Posner principles to this particular setting.
We also pause to note that before Casto reached the supreme court, this court had occasion to address the validity of postnuptial agreements in a number of cases. For example in Zakoor v. Zakoor, 240 So.2d 193 (Fla. 4th DCA 1970), we upheld such an agreement. In reversing the trial court's decision invalidating the agreement, we concluded that the wife had sufficient general knowledge of the financial affairs of her husband. In fact we noted:
"If the wife was dissatisfied with the extent of her knowledge of her husband's property she could have made informal inquiries of the husband, through her attorney, or resorted to the ample discovery procedures provided by the Rules of Civil Procedure."
240 So.2d at 198. We relied on Del Vecchio, but also cited the earlier decisions in Underwood v. Underwood, 64 So.2d 281 (Fla.1953), and Miller v. Miller, 149 Fla. 722, 7 So.2d 9 (1942).
In Fleming v. Fleming, 408 So.2d 238 (Fla. 4th DCA 1981), however, we reversed a trial judge for failing to hold an evidentiary hearing on a claim that a litigation settlement agreement was unfair to the wife. The agreement was reached nearly 18 months after the action for dissolution of marriage had been filed, and on the very day set for the final hearing. Both parties were represented by capable counsel and had ample opportunity for adequate discovery as to the other's financial affairs. As here, the wife later retained new counsel and filed a petition to rescind the agreement. The husband, in turn, filed a motion to compel performance of the agreement.
Over the objection of the new counsel, the trial court allowed the former counsel to participate in the hearing on the two applications, to make argument and to cross-examine witnesses. Her former counsel was also allowed to exclude any issue of fairness of the agreement and to limit the attack to fraud, undue influence and duress. The trial judge refused to permit her to attack the settlement as unfair, saying that it was "a day late and a dollar short." In reversing, we explained:
"Clearly, then, in a case where an agreement is alleged to be patently unfair, as here, the first order of business is for a court to make a determination as to whether the provisions made for a wife on the face of an agreement are, in the language of Del Vecchio, `disproportionate to the means of the husband.' 143 So.2d at 20. If the agreement is found to be unreasonable on its face, the presumption that the husband concealed assets would arise and this, in turn, would shift the burden of proof to him to establish the validity of the agreement. Since, by the trial court's own admission, no determination as to the fairness of the agreement was made herein, we reverse and remand for consideration of this issue."
408 So.2d at 240. We also stated the following:
"we feel compelled to note that there is some merit to her contention that her prior attorney should not have been allowed to participate in the hearing on the petition to vacate or rescind the settlement. It is clear that [her former counsel's] interests were adverse to those of Mrs. Fleming since she, in essence, was alleging that her prior attorney had participated in the alleged coercion which resulted in her oral acceptance of the agreement."
408 So.2d at 240-241. Our opinion fails to mention or discuss whether she had, or was charged with having, adequate knowledge of his finances as a result of the opportunity for discovery during the dissolution litigation. We relied on Del Vecchio, as well as Posner *909 and our own previous decision in Baker v. Baker, 394 So.2d 465 (Fla. 4th DCA 1981).[2] In retrospect, a reversal would appear to have been necessary if only because of the participation of the former lawyer, thereby depriving the wife of the opportunity of having her chosen lawyer speak for her. Nevertheless, the opinion squarely stands for the proposition that even a litigation settlement is subject to a fairness analysis by a judge when a proper application has been made.
In Kerns v. Kerns, 409 So.2d 137 (Fla. 4th DCA 1982), we also reversed an order denying a petition to set aside a property settlement agreement and remanded for an evidentiary hearing. Our opinion does not make clear the context in which the agreement was concluded. We do not know from the opinion whether the agreement was a settlement of litigation or merely a postnuptial accord. We stated that:
"It has become equally well established, however, that if such an agreement is unreasonable on its face then a presumption of concealment arises and the burden shifts to the proponent of the agreement to prove its validity."
409 So.2d at 138. We conceived the issue as whether the petitioner's allegations were sufficient "to put the trial court on notice of a claim of facial unreasonableness of the agreement." Id. The parts of the petition quoted in our opinion were deemed sufficient to state a claim of facial unreasonability. As in Fleming, there is nothing stated in the opinion to suggest that a facially unreasonable agreement would be enforced if the complaining spouse had voluntarily agreed with knowledge of the financial circumstances.
Turning now to Casto, the court there confronted an agreement made just one year before the husband filed his action to dissolve the parties' 10-year marriage. She sought to have the agreement set aside on the grounds of duress and overreaching. She also alleged that she lacked adequate knowledge of his financial picture at the time of contracting, resulting in an unfair disposition of marital property. The court's opinion notes that "the husband did not advise the wife on the value of his assets," that the husband told her that unless she signed the agreement she would lose her house and furniture, and that she was deeply depressed the week before signing the agreement. 508 So.2d at 332. The trial court set aside the agreement upon a finding that the wife was coerced into the agreement, that it was made without adequate knowledge of his assets, and without the assistance of competent counsel, and that it was unfair and inequitable to the wife. This court affirmed that decision. Casto v. Casto, 458 So.2d 290 (Fla. 4th DCA 1982).[3]
The supreme court granted review to clarify the grounds on which a trial court could vacate or modify a postnuptial agreement in a later dissolution of marriage proceeding. 508 So.2d at 333. The court began by stating that there are essentially two separate grounds for invalidating such agreements. The first ground deals with fraud, duress, coercion, misrepresentation, or overreaching. Id. The second groundwhich we shall call unfairnessis the one relied upon by the wife in this case. It was explained by the court as follows:
"The second ground to vacate a settlement agreement contains multiple elements. Initially, the challenging spouse must establish that the agreement makes an unfair or unreasonable provision for that spouse, given the circumstances of the parties. Del Vecchio, 143 So.2d at 20. To establish that an agreement is unreasonable, the challenging spouse must present evidence of the parties' relative situations, including their respective ages, health, education, and financial status. With this basic information, a trial court *910 may determine that the agreement, on its face, does not adequately provide for the challenging spouse and, consequently, is unreasonable. In making this determination, the trial court must find that the agreement is `disproportionate to the means' of the defending spouse. Id. This finding requires some evidence in the record to establish a defending spouse's financial means. Additional evidence other than the basic financial information may be necessary to establish the unreasonableness of the agreement.
"Once the claiming spouse establishes that the agreement is unreasonable, a presumption arises that there was either concealment by the defending spouse or a presumed lack of knowledge by the challenging spouse of the defending spouse's finances at the time the agreement was reached. The burden then shifts to the defending spouse, who may rebut these presumptions by showing that there was either (a) a full, frank disclosure to the challenging spouse by the defending spouse before the signing of the agreement relative to the value of all the marital property and the income of the parties, or (b) a general and approximate knowledge by the challenging spouse of the character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties. The test in this regard is the adequacy of the challenging spouse's knowledge at the time of the agreement and whether the challenging spouse is prejudiced by the lack of information. Id. See Belcher v. Belcher, 271 So.2d 7 (Fla.1972); Del Vecchio."

508 So.2d at 333. Critical to this case, the court stated an important qualification on its holding:
"As reflected by the above principles, the fact that one party to the agreement apparently made a bad bargain is not a sufficient ground, by itself, to vacate or modify a settlement agreement. The critical test in determining the validity of marital agreements is whether there was fraud or overreaching on one side, or, assuming unreasonableness, whether the challenging spouse did not have adequate knowledge of the marital property and income of the parties at the time the agreement was reached. A bad fiscal bargain that appears unreasonable can be knowledgeably entered into for reasons other than insufficient knowledge of assets and income. There may be a desire to leave the marriage for reasons unrelated to the parties' fiscal position. If an agreement that is unreasonable is freely entered into, it is enforceable. Courts, however, must recognize that parties to a marriage are not dealing at arm's length, and, consequently, trial judges must carefully examine the circumstances to determine the validity of these agreements."
508 So.2d at 334.[4] Thus did the court clarify its prior holdings.[5]
As the court emphasized, "[i]f an agreement that is unreasonable is freely entered into, it is enforceable." 508 So.2d at 334. The narrowness of this holding undoubtedly arises from its earlier decisions laying down an elementary principle from our common law: freedom to contract is fundamental, and the contracts of capable people are enforced by courts even when the bargain is difficult. This basic principle finds no better expression than in Pierce v. Isaac, 134 Fla. 666, 184 So. 509 (1938), where the court said:
"Courts are without power to make contracts for parties, or to rewrite, alter or change the same when made, but have and *911 possess the power of interpretation according to established rules. It is not within our jurisdiction to pass upon the wisdom or folly of the contracts here but this right will be left to the parties and well be held void only when made in derogation of some well recognized principle of law....

"The general rule is that competent parties shall have the utmost liberty of contracting and their agreements voluntarily and fairly made will be upheld and sustained by the courts. All parties sui juris are free to make whatever contract they may choose so long as no fraud or deception is practiced and there is no infraction of law. The fact that one of the parties to a contract made a hard bargain will not alone avoid a contract. See Sommers v. Apalachicola Northern R. Co., 85 Fla. 9, 96 So. 151; Continental Casualty Co. v. Bows, 72 Fla. 17, 72 So. 278; Clay v. Girdner, 103 Fla. 135, 138 So. 490; Gabel v. Simmons, 100 Fla. 526, 129 So. 777; Newsom v. Acacia Mut. Life Ass'n, 102 Fla. 567, 136 So. 389; Pine Lumber Co. v. Crystal River Lumber Co., 65 Fla., 254, 61 So. 576; Mizell Live Stock Co. v. McCaskill Co., 59 Fla. 322, 51 So. 547; Frissell v. Nichols, 94 Fla. 403, 114 So. 431; Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 So. 761; Holmberg v. Hardee, 90 Fla. 787, 813, 108 So. 211; Eubanks v. Southern R. Co., D.C., 244 F. 891; Ireland v. Craggs, 5 Cir., 56 F.2d 785, 787." [emphasis supplied]
184 So. at 512-513; see also Squires v. Citrus Fruit Products, 140 Fla. 253, 191 So. 455 (1939) (contract will stand as made by the parties even though unfavorable to one of them); Int'l Ass'n of Machinists v. State ex rel. Watson, 153 Fla. 672, 15 So.2d 485 (1943) (parties may negotiate any contract not contrary to law or good morals); Richardson v. Holman, 160 Fla. 65, 33 So.2d 641 (1948) (any citizen who is sui juris may enter into any contract that is not illegal, fraudulent, immoral or contrary to public policy); Saunders v. Cities Service Oil Co., 46 So.2d 597 (Fla.1950) (any citizen who is sui juris may enter into any agreement not illegal or contrary to public policy or prohibited by statute). Obviously under Florida's common law, it is ordinarily not the province of judges to say whether a voluntary agreement is fair to one of the contracting parties. Courts are obligated to uphold even hard or bad bargains freely made without fraud or coercion, so long as they are not against public policy.
In order to be faithful to this primary contract law, it is critical to acknowledge the narrowness of the Casto holding as stated by Justice Overton. Bad domestic bargainsmeaning unfair or unreasonable property and monetary settlement agreementsare nevertheless enforceable so long as they are knowing, voluntary and not otherwise against public policy. Casto makes very clear to us that, unless a party can show the reasonable lack of sufficient knowledge of the parties' financial resources, there can be no judicial inquiry into the agreement's fairness.
Because Casto really turns on the adequacy of the knowledge of the challenging spouse as a predicate for an unreasonableness challenge, it is restricted to those circumstances in which the adequacy of knowledge might plausibly be raised. The adequacy of knowledge can be plausibly raised only when the agreement was reached by marital parties in conditions of mutual trust and confidence and who were, therefore, not dealing at arm's length.[6] The wife in this case attempts to imply that even when the parties are engaged in contested dissolution of marriage proceedingswhen there has been ample opportunity for the party to make use of the procedural rules for discovery of financial resourcesa party can still plausibly allege that the they were still dealing in mutual trust and confidence and not at arm's length or from inadequate knowledge of finances.
We are compelled by the supreme court holdings discussed above to reject the wife's argument. Once the parties are involved in full fledged litigation over dissolution property and support rights, they are necessarily dealing at arm's length and without *912 the special fiduciary relationship of unestranged marital parties. As we noted in Zakoor, there can be no question of the adequacy of knowledge when an adversarial party has had the opportunity of financial discovery under the applicable rules of procedure. The Casto line of cases, therefore, logically has no application when the challenging spouse has had the benefit of litigation discovery through independently chosen counsel to learn the full nature and extent of the finances of the other spouse. The very purpose of litigation discovery is to unearth the other party's assets and income. The law quite properly presumes that a litigation settlement made after discovery and just before trial was done with full knowledge by the challenging spouse.[7]
This litigation settlement presumption arises from the special treatment that courts give to voluntary settlements of lawsuits. Under the rule for consent judgments, an agreement settling litigation cannot be opened, changed or set aside without the assent of the parties in the absence of fraud, mutual mistake, or the actual lack of consent. See DeFusco v. Giorgio, 440 A.2d 727 (R.I. 1982); State ex rel. Adult & Family Services Division v. Hansen, 54 Or.App. 47, 634 P.2d 256 (1981); State v. One 1969 Dodge Charger Automobile, White Over Red, Serial Number VIN XP29H96167914, 268 N.W.2d 142 (S.D. 1978). The obvious intent behind the consent judgment rule is that it ought to be very difficult to unsettle an agreement settling litigation. Settlements of civil lawsuits merit the greatest protection from judges. See, e.g., Robbie v. City of Miami, 469 So.2d 1384 (Fla.1985) ("[S]ettlements are highly favored and will be enforced whenever possible."); Dorson v. Dorson, 393 So.2d 632 (Fla. 4th DCA 1981) ("[A] stipulation properly entered into and relating to a matter upon which it is appropriate to stipulate is binding upon the parties and upon the Court. This is especially true of settlement agreements which are highly favored in the law."). In short, it is the policy of this state to encourage settlements and enforce them whenever it is possible to do so.
In order to avoid an agreement settling a dissolution of marriage action in which the parties were adversaries, to be consistent with Casto and the common law the challenging spouse is similarly limited to showing fraud, misrepresentation in the discovery, or coercion. The supreme court's cases preclude judicial inquiry into the reasonableness of a litigation settlement to either party. The parties alone are competent to say what is reasonable to resolve a lawsuit and what is not. If parties choose to settle a case without fraud or coercion after adequate opportunity to engage in discoveryfrom which ample knowledge must be presumedthey should not be heard to assail the relative fairness of the bargain. If they agreed to the terms, it is presumptively and conclusively fair as a matter of law.
To allow this kind of "reasonableness" challenge to a litigation settlement agreement also threatens the likelihood of settlements in many cases and thus would require more trials on the merits. If one of the settling parties can have the court later inquire into its reasonableness and fairness, there would be little incentive for courts to encourage settlements. For it is undoubtedly true that, in deciding the reasonableness of a marital property settlement, the court is really trying the merits of the underlying dispute. If the trial judge is going to be called upon to decide what a fair division of property and support is anyway, settlement is a waste of time and the parties might just as well proceed directly to trial and have a judicial disposition.
Apart from misreading Casto, the wife here relies on the pre-Casto cases of Kerns and Fleming. Both of these decisions, however, as we have endeavored to show, are directly affected by the supreme court's later clarification in Casto. Both seem to proceed on the assumption that the trial judge has some general authority to pass on the fairness or reasonability of litigation settlements in dissolution cases. Casto makes clear that the reasonability or fairness of a pre litigation *913 settlement is open to question by a judge only when there is some reason to suppose from the relationship of mutual trust and confidence that the parties were not dealing at arm's length and that the agreement resulted from inadequate disclosure of financial resources. After resorting to litigation over marital property rights, neither party can be thought dealing as fiduciaries or inadequately informed as to financial affairs. To the extent that Kerns and Fleming are inconsistent with Casto, we believe they have been inferentially disapproved by the supreme court.
It is clear to us that the wife in this case has made no allegation of fraud or coercion in her motion to invalidate the settlement agreement. A fair and reasonable agreement is what negotiating and bargaining are for, whether they occur in formal mediation or by informal settlement conferences just before trial. We must therefore leave the parties, as this trial judge did, with the bargain they struck. We thus return this case to the trial court to resolve the ambiguity as to the challenged provision.
WARNER, J., and DONNER, AMY STEELE, Associate Judge, concur.
NOTES
[1] The agreement as contended by the husband below was that the wife gets the marital home, from which she must satisfy mortgages not exceeding $45,000, after which she would get all profits. He argues that the essence of the understanding was that she would realize $115,000 to $120,000 on a sale of the property. It turns out that there were actually two mortgages in question, however, both disclosed on the wife's financial affidavit. One of the mortgages encumbered the marital home, while the other encumbered another piece of property, but together they do not exceed $45,000. The wife argues that she actually agreed to satisfy only the mortgage encumbering the marital home.

In denying her motion to set the agreement aside as unreasonable, the trial judge appears to have summarily resolved the ambiguity. In order to properly resolve the ambiguity, however, on remand the trial judge should first afford both parties the opportunity to offer evidence as to their actual intent.
[2] In Baker, we considered only whether an agreement was the product of fraud, duress, coercion, or overreaching, expressly disclaiming any consideration of unfairness.
[3] In affirming our decision, the supreme court rejected any reliance on competent assistance of counsel as a ground for invalidating postnuptial agreements. The court noted that such a holding would be inconsistent with its previous holdings that a "complaining spouse need not have legal counsel for a valid agreement." Casto, 508 So.2d at 334; see also Cowen v. Cowen, 95 So.2d 584 (Fla.1957), and Bubenik v. Bubenik, 392 So.2d 943 (Fla. 3d DCA 1980), neither of which were disapproved in Casto. 508 So.2d at 334.
[4] Cf. Seiffert v. Seiffert, 702 So.2d 273 (Fla. 1st DCA 1997) (inequity in property distribution, coupled with fact that agreement was drawn by adverse spouse and not read by complaining spouse legally insufficient to set agreement aside under Casto).
[5] In the course of his opinion, Justice Overton characterized the agreement in Casto as a "settlement agreement." 508 So.2d at 334 ("the fact that one party to the agreement apparently made a bad bargain is not a sufficient ground, by itself, to vacate or modify a settlement agreement." [emphasis supplied]). From its context, he obviously referred to what has become known in family law as a property settlement agreement. As we shall show, litigation settlement agreements are different.
[6] See Del Vecchio, 143 So.2d at 21 ("The relationship between the parties to an antenuptial agreement is one of mutual trust and confidence. Since they do not deal at arm's length they must exercise a high degree of good faith and candor in all matters bearing upon the contract.").
[7] We note that the wife makes no suggestion, veiled or otherwise, that any of husband's discovery responses was false or intentionally misleading, and that she relied on such a false representation when she entered into the settlement agreement.