ROTHENBERG, J.
Stella Maris Parra de Rey a/k/a Stella Maria Parra de Rey (“the Wife”) appeals from a final judgment for dissolution of *374 marriage entered pursuant to Alfonso Rey’s (“the Husband”) motion for summary judgment, upholding the validity of a marital settlement agreement entered into between the parties. We affirm.
The Husband and the Wife married in 1982. During their twenty-eight year marriage, the Husband became a successful businessman, amassing substantial wealth. During that same time, the Wife owned and operated a series of beauty supply businesses.
Eventually, the parties experienced marital difficulties, and in December 2007, the Husband filed a petition for dissolution of marriage (“the First Dissolution Action”). During the pendency of the First Dissolution Action, the parties, who were attempting to resolve their differences, began to negotiate a marital settlement agreement that would control the terms of any future dissolution.
In January 2008, the Husband’s attorney sent the Wife’s attorney and the Wife’s accountant a draft of a proposed agreement, along with a box of various personal and corporate financial records. In response, the Wife requested that the Husband submit a financial affidavit and other financial records, which the Husband immediately provided. After the Wife reviewed the additional documents with her counsel and forensic accountant, the Wife’s accountant compiled a list of additional financial documents to be produced by the Husband. After the Husband’s counsel received the list, which the Wife’s accountant admitted was quite expansive, the parties set a meeting to “try to narrow down what [the accountant] really needed” and possibly to reach a settlement.
That meeting took place on March 10, 2008, with the Husband, the Wife, their attorneys, and their accountants in attendance. At some point during the meeting, the Husband proposed settlement terms. The Wife’s accountant, however, indicated that neither he nor the Wife’s counsel could make any recommendations until the Husband furnished additional financial information. The Husband agreed to provide the additional records, but also withdrew the settlement offer. As the Wife’s counsel confirmed:
Q. Then at that point Mr. [Roberto] Dilena— [, the Husband’s accountant,] went outside with Mr. Rey and myself. We came back in and said, “Nevermind. If you want, we have no problem. We will give you the records and we will do this again another day, but we will withdraw our offer at this time.”
A. That’s correct.
The Wife then spoke with her lawyer and accountant; told them she wanted to take the offer even though the Husband had not yet furnished the additional financial statements; and instructed her accountant not to seek additional financial- disclosure. The Wife’s counsel and the Wife’s accountant both advised her not to accept the offer without additional financial disclosure. Specifically, the Wife’s accountant explained as follows:
A. I explained to her that I could not make any conclusion of value on any of the entities or a conclusion of value as to income or any other assets until I concluded my due diligence, which included the proposed meeting with myself and ... the husband’s accountant to go over the items that I needed to complete my valuations.
[[Image here]]
Q. So what was her response?
A. Her response 'was that she wanted to take this offer and she wanted not to continue on with the valuations.
[[Image here]]
Q.... Your recommendation was you could make no recommendation until all *375 the records were reviewed, analyzed and values affixed on everything?
A. That is correct.
Q. Ms. Parra chose to ignore that advice, correct?
A. Ms. Parra said she wanted to settle her case.
[[Image here]]
Q.... You were prepared to do whatever discovery needed to be done in order to make recommendations as to income, valuations of assets, valuations of liabilities, correct?
A. That is correct.
Q. You were prepared to do a lifestyle analysis if one were required?
A. Yes.
Q. You were going to do everything?
A. Whatever was requested of me, absolutely.
Q. And the only reason you didn’t is because she told you to stop?
A. Yes.
[[Image here]]
A.... I expressed to her that I could not make any determinations, and I could not advise her as to whether any of the values on that chart were correct or not without completing my work which consisted of me doing my due diligence on all of the companies and all of the assets.
Q. Did you suggest that maybe she should just wait a while and see what you came up with before she made such a decision?
A. I had suggested that she let me work with the accountant on his offer to review the rest of the records and complete my work with respect to the valuations.
Q. Her decision or statement to you was?
A. Her decision was she wanted to accept the offer and not continue on with the valuations.
The Wife’s accountant and the Wife’s counsel also confirmed that the Husband had been completely cooperative with respect to his financial disclosures up until the point the Wife instructed them to discontinue seeking financial information. In this regard, the Wife’s accountant testified as follows:
Q.... At any time during the litigation, did either Mr. Rey or myself refuse to provide you with records that you were requesting?
A. No.
Q. Were Mr. Rey and my office cooperative in trying to provide you with documentation?
A. Yes.
Q. Now, obviously you didn’t have every single record and that would take a period of time. But did you find that whatever was requested, Mr. Rey was making his best efforts to obtain those records for you?
A. Yes
Q. Did you ever find in the case that Mr. Rey or myself were in any way trying to frustrate the discovery process?
A. No.
[[Image here]]
A. I received initially, without a request, a box of documents from your office. Upon reviewing and analyzing the records I received from your office, I put out a request list for additional documents, but the bulk of the documents came without me even requesting them.
Q. So it was done voluntarily?
A. It was done prior to me even issuing a document request, correct.
[[Image here]]
*376 Q. Were there discussions that Mr. Dilena would be in contact with you directly and you with him directly without the intervention of the lawyers, to try to gather up whatever documentation you needed?
A. That’s correct.
The Wife’s counsel likewise confirmed that the Husband cooperated with respect to his financial information:
Q. Now, up to that point did you see any efforts on the part of my office to frustrate your request for documents?
A. No.
Q. Did you request any documents that you’re aware of that we just said we’re not going to give to you?
A. No. There were outstanding document requests, but there was not a flat out denial of providing a document.
Q. And some records were coming, not all at one time, but records were being provided to Mike Everett, [the Wife’s accountant]?
A. Correct.
Q. So basically as we received them they were going over to your side?
[[Image here]]
A. To the best of my knowledge, yes.
Over the next few months, the parties engaged in negotiations, which the Wife admits resulted in the incorporation of several terms that were to her benefit. In June 2008, the Husband provided a second financial affidavit to the Wife. Between June 20, 2008, and July 12, 2008, the Wife met with her counsel six times to discuss the proposed agreement. The Wife’s accountant explained to the Wife the terms of the agreement in great detail. Additionally, the Wife’s accountant composed and presented to the Wife an equitable distribution schedule from the financial information he had obtained from the Husband, which demonstrated that the Wife should receive an additional $7,033,435 to equalize the proposed share of assets.
Q. So, according to your Equitable Distribution Schedule that you prepared with the numbers that you applied, in order to equalize Mr. Rey would have owed to Ms. Parra $7,033,435; correct? A. Yes, correct.
[[Image here]]
Q. Was this schedule provided to Ms. McMillan?
A. Yes.
Q. Was it provided to Ms. Parra, to the best of your knowledge?
A. Yes.
[[Image here]]
Q.... Assuming she did not receive the equalization payment and everything was left in the columns that you have, then that deal would not have been a good deal that was bargained?
A. Based on this chart if she didn’t receive this equalizer, then no.
Q. But that was communicated to her, to the best of your knowledge?
A. To the best of my knowledge.
[[Image here]]
Q. So this was all discussed beforehand?
A. This schedule was absolutely discussed, yes.
Q. What did Ms. Parra say about it?
A. She wanted to accept the offer.
Q. In spite of the disparity in the offer?
A. She understood the disparity, but she wanted to accept the offer.
The Wife’s counsel explained to the Wife that she did not need to sign the agreement, and she could continue to pursue further financial disclosure and engage in additional negotiations. The Wife, howev *377 er,- insisted on entering into the agreement.
The agreement, which explained that the parties were attempting to reconcile and “strengthen their marriage,” was signed by the Husband on July 21, 2008, and by the Wife on July 23, 2008. Pursuant to the agreement, the Wife would receive over $6.8 million of the parties’ assets, including $175,000 cash upon the execution of the agreement. The Husband would retain the remaining assets. The agreement also provided that each party waived any claim to alimony. Regarding the vol-untariness of the execution of the agreement, the agreement states that:
8.1. Each party has had the opportunity to have independent counsel and legal advice of his or her own selection in the negotiations and in the preparation of this Marital Settlement Agreement. ...
[[Image here]]
8.3. Each party executed this Agreement freely and voluntarily, and each party believes that the provisions of this Agreement are fair, reasonable and just....
8.4. Each of the parties to this Agreement acknowledge (sic) that each has been given full and complete access to each other’s financial records. Each party acknowledges that he or she has the absolute right and entitlement to inquire into the financial condition of the other, but has specifically chosen not to pursue such financial discovery. Further, each party waives any additional financial disclosure from the other as to income, assets, liabilities and expenses. Each party represents that this Agreement is fair and equitable, and that he and she do not wish to expend the time and money to engage in further discovery, and each believes he and she has an adequate knowledge of the other’s exact financial circumstances with reference to entering into this Agreement.
The Wife’s counsel testified that she did not believe that the Wife was under any type of duress when she executed the agreement:
Q. Would you ever allow a client of yours to execute an agreement if you believed that they were under any type of coercion or duress?
A. Never.
Q. We will go into some of the documentation. From your observations, did you believe that the wife in this ease, in the Rey case, did you believe she was under any type of coercion or duress?
[[Image here]]
A. No.
[[Image here]]
Q. Did you believe, without going into the details, that you and Mike Everett [Wife’s accountant] provided her with the pros and cons of signing the Agreement?
A. Definitely.
Q. Did she appear in any way to be reluctant to sign the Agreement at that time?
A. In fact, no. She wanted to sign the Agreement.
Q. She was enthusiastic about signing it?
A. Yes
Q. Did she appear to be happy that she was signing it at that point, to the best of your knowledge and observations.
A. She was happy to sign it.
[[Image here]]
Q. Did you at any time have an impression that she was signing this against her will?
A. No.
[[Image here]]
*378 Q. Or that she was defrauded?
A. No.
Q. In fact, Mike Everett [Wife’s accountant] said to her at your meeting with her when the equalization was going on that he can still get records and nobody had to sign this right away. Do you remember that?
A. Yes.
Q. Did she indicate to Mike Everett she wanted no further production?
A. She indicated she was done and was ready to sign the Settlement Agreement.
Q. Did Mike Everett indicate that his preference would be to get additional records so he could give a more accurate recommendation to your former client?
A. Yes.
Q. And she refused? She refused those suggestions, correct?
A. She went ahead and signed the Agreement, yes.
[[Image here]]
Q. And you discussed the ramifications of each provision?
A. Of course.
Likewise, the Wife’s accountant testified that the Wife did not appear coerced into signing the agreement.
Q. Did you see any coercion or duress by Mr. Rey or by my office during your period of time in sessions here with her that day?
[[Image here]]
Q. Did you see any threats on his part, any coercion, any duress, any forcing from him for her to take this deal?
A. Not while I was here, no, sir.
[[Image here]]
Q. Did she appear to be in any way distraught or hysterical or unraveled at all when she told you [that she wanted to accept the offer]?
A. No, I don’t think so.
[[Image here]]
Q. ' Did Ms. Parra ever tell you she was forced into this agreement?
A. No.
Q. From your communications with her, was she ever forced into this agreement?
A. Not by myself, no.
Q. Or by anybody?
A. Not to my knowledge.
[[Image here]]
Q. Did she indicate anything else to you at all; that he threatened her, he forced her into this agreement, anything at all?
A. No, she never made any indication to me of any of those issues.
After the execution of the agreement, the Husband filed a motion for the trial court to adopt and ratify the agreement, as contemplated by paragraph 20 of the marital settlement agreement. At a hearing on the motion, the Wife testified that she understood the agreement, entered into it freely and voluntarily, reviewed it with her counsel, and accepted its terms. The entire questioning by the Husband’s counsel and the trial court is set forth below. First, the Husband’s counsel questioned the Wife as follows:
Q. Now, you understand the agreement, correct?
A. Yes.
Q. You had your attorney go through the agreement with you?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. And you understand this is the final agreement?
A. Yes.
Q. And if later the two of you don’t stay married for whatever reason, you *379 don’t get more and don’t get less. This is the agreement?
A. Yes.
Q. And that is acceptable to you?
A. Uh-huh, yes.
Q. Are you entering into this agreement freely? So you are doing it on purpose, you understand it?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Voluntarily?
A. Voluntarily.
Q. And with the advice of your lawyer?
A. Yes.
Q. And you understand you could have had a judge make a final decision, but this is good for you, correct?
A. Yes.
Q. You are satisfied with it?
A. Yes.
Q. Nobody has forced you in any way to sign this, is this correct?
A. No, no nobody forced me.
Then, the trial court questioned the Wife as follows:
Q. So you are comfortable that you totally understand the agreement?
A. Yes, I understand the agreement.
Q. Okay. And you are satisfied with your attorney?
A. Yes, I am satisfied.
Q. All right. And you understand, as I told your husband, that I hope you stay together, but if you do not, that he can walk into court at any time and say, “Okay. I want a divorce,” and I say “All right. Here is the agreement. The property is divided. You get a divorce.” You understand that?
A. Yes, I understand that.
Q. Okay. And that is okay with you?
A. Yes, that is okay.
After questioning the Wife, the trial court adopted and ratified the agreement. The First Dissolution Action was thereafter dismissed on February 12, 2010, for lack of prosecution.
In February 2011, the Husband filed a second petition for dissolution, asking the trial court to distribute the assets pursuant to the marital settlement agreement. ■ The Wife responded by raising the following affirmative defenses:
1. The Marital Settlement Agreement (MSA) was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching by the Husband, and therefore should be vacated.
2. The MSA makes unfair or unreasonable provision for the Wife, given the circumstances of the parties at the time, and therefore should be vacated.
3. The MSA, on its face, does not adequately provide for the Wife. Consequently, it is unreasonable and should be vacated.
Based on these affirmative defenses, the Wife demanded additional, extensive discovery of financial documents from twenty-nine corporations. The Husband filed objections to these discovery requests, characterizing them as a “fishing expedition,” and requested that before the production of any documents, the Wife be deposed.
The Wife’s deposition reflects that she was questioned regarding her ability to obtain more documents prior to signing the agreement and her choice not to do so; her accountant’s advice not to sign the agreement until he obtained the additional financial disclosures from the Husband; and the Wife’s instruction to her accountant not to pursue the additional financial disclosures:
Q. Do you remember Mike ever telling you that he would get more documents if *380 you wanted them before you signed the Post-Nuptial Agreement?
[[Image here]]
Q.... In fact, Michael Everett told you that he [w]as going to get more records. Do you remember that?
A. He said that he could obtain more records or that they were going to provide him with more information.
Q. Do you remember telling him you did not need any more records, you were signing the agreement.
A. Yes, it could be. Yes.
Q. Not it could be. It was what happened, was it not?
A. Yes, yes.
Q. Michael Everett suggested to you that it would be wise to get more records before you signed the agreement. Do you remember that?
A. Yes, yes.
[[Image here]]
Q.... Did you ever go through the records that your husband provided to the accountant?
A. No.
[[Image here]]
Q. So when Michael Everett said to you that you could look through more records, why did you say there was no need to look at anything else?
A. Because my husband had convinced me that the businesses were nearly bankrupt and that they were worthless; to believe him that he was not lying and that the businesses were not doing well. Q. Well, wouldn’t that be even more of a reason to have Mike Everett look at the numbers to see if, in fact, that was accurate or not?
A. I don’t know.
The Husband’s counsel also questioned the Wife regarding her allegations of fraud. The Wife claimed the Husband defrauded her by characterizing his businesses as “bankrupt” and deceiving her into believing he had “no money in the bank.” However, through questioning, the Husband’s counsel ultimately established that the Wife’s allegations were completely unsubstantiated, and that the financial disclosures the Husband had provided to the Wife rebutted each of the Wife’s claims. With respect to the Husband’s businesses, the Husband’s counsel questioned the Wife as follows:
Q. Which businesses did he tell you were bankrupt?
A. Centurion and Cielos Airline, MTA and Record Air Parts and everything. ...
Q. When you say “everything-,” what else?
A. Record Air Parts and Record Air Service. I don’t remember the other companies.
Q. These are the principal companies? A. The principal companies. And DC 10, what is it called? I don’t recall. The lease — no.
Q. Well, these were the companies that you wanted Mike Everett to review records from, did you not?
A. Those are the companies that he presented the records to be checked. Q. So those records for these companies were given to Mike Everett, correct?
A. I suppose so. I didn’t see them.
[[Image here]]
Q. You told us that your husband represented to you that these companies were bankrupt. One was Cielos, C-IE-L-O-S, another was Centurion and then Sky Lease I and II, is that right? A. That they were doing bad, financially they were not doing well.
[[Image here]]
*381 Q. So what were they really worth then?
A. I don’t know.
Q. So you don’t know if he told you the truth or not, do you?
A. I know that he lied to me.
Q. Tell me, please, what investigation you have done by review of any records since July 23rd, 2008, which leads you to the opinion that he lied to you.
A. I don’t have records or documents that he lied to me, but ...
Q. “But” what?
A. But his lifestyle and what he spends in one month, I don’t spend it in one year.
Q. Let me make sure I’m clear then. What you’re saying is he must have lied to you because he has a much higher lifestyle than you would expect for him to have based on what he was left with. Is that what you’re telling us?
A. No. no. With what I have or what was given to me, I cannot live within the same lifestyle that I have previously.
[[Image here]]
Q. Well, you said in your answer to the divorce that the Marital Settlement Agreement was reached under fraud. I want to know every single basis for fraud that you are aware of.
A. I cannot answer with specific details on that, but my attorney is the one that can.
Q. I’m not asking about your lawyers. I’m asking about you. And my question to you is, I want to know every specific document or instance or misrepresentation or omission that would constitute fraud.
A. As far as I know, he omitted or hid information.
[[Image here]]
Q. Well, you have no proof of any assets that he had at the time of the agreement that were not disclosed, do you?
A. If I have any proof?
Q. Yes. , •
A. No.
Q. Now, in fact, when you said before that he had represented to you that Centurion Air Cargo was doing poorly and was almost bankrupt, you believed that to be the case, did you not?
A. Of course. I believed him.
Q. Well, his financial affidavit of June 20th said the value was $5,372,102 as of 2007. You knew that?
A. Yes, that’s what is written there, five million.
Q.... Now let’s go into these businesses that you said your husband represented were near bankrupt. Cielos, which you said he represented was near bankrupt. I want you to turn to page six.
[[Image here]]
Q. Take a look at what it says for the 49 percent interest in Cielos Airlines that you told us your husband said was almost bankrupt. What is the value? A. Cielos, $4,502,108.
[[Image here]]
Q. So, I want you to tell us, please, under this agreement what the net worth was for you and your husband. If you take a look on page number seven the assets are over 19 million dollars. Then on page eight the debts are about [$]449,000. So the two of you had a net worth of 19 million dollars at least, did you not?
A. Yes.
[[Image here]]
A. But I never saw that he had a salary of $81,000 a month.
*382 Q. Ma’am, it was provided to your attorney.
A. Okay.
Q. It was provided to the accountant.
A. I never saw it.
Q. In fact, in the financial affidavit provided to your attorney, there is one of February 4th, this is in the file we were provided from your attorney which showed $208,000 a month.
A. I didn’t see that, no.
[[Image here]]
Q. What facts do you have to show those numbers are wrong?
A. I don’t have any evidence because the accountant has to do the work first to determine it.
With respect to the amount of money, or lack thereof, the Husband had in the bank, the Husband’s counsel questioned the Wife as follows:
Q. Now, is there any other basis for fraud that you can tell us about?
A. He said that he didn’t have any money in the bank.
Q. When did he say he had no money in the bank?
A. During the agreement he said that he didn’t have any money, so he didn’t give me any cash.
[[Image here]]
Q. So how come on his financial affidavit he shows $604,207?
A. It was in his account, not in my account.
Q. I understand. But you just said he had no money.
A. He didn’t give me any cash.
Q. My question was any basis for fraud, and you said he said he had no cash. But you were aware of a financial affidavit that he provided to your attorney that showed he had $604,207 in banks as of June 20th of 2008, correct?
A. Okay. So?
Q. So your husband represented, in fact, he did have cash at the time, did he not?
[[Image here]]
A. It’s not that he told me that he didn’t have any money. I only received the properties. I didn’t receive any cash.
The Wife also alleged that the Husband had concealed the existence of a Hialeah property he owned, but after questioning, she admitted that she knew about the property at the time of the execution of the agreement; the Husband had mentioned the property prior to the execution of the agreement; and the Husband may have disclosed the existence of the property through his financial disclosures, but she had not checked them to confirm. With regard to the Wife’s allegation that the Husband hid unspecified ownership interests in unspecified Uruguayan companies, the Wife ultimately admitted that the sole basis for this allegation was that the Husband’s brother and his accountant owned office space in Uruguay, and the Husband maintains an office with them in Uruguay. The Wife, however, could not provide any evidence suggesting that the Husband possessed an ownership interest in any undisclosed Uruguayan companies. The Wife also confirmed that she knew about this office when she signed the agreement. And, as to the Wife’s allegation that the Husband concealed his ownership interest in an Islamorada property, the Wife admitted she did not know whether he purchased the property prior to or after the execution of the agreement.
The Husband’s counsel also questioned the Wife regarding her allegations of duress, coercion, and overreaching. The Wife testified that the marital settlement agreement was the product of duress and *383 coercion because the Husband had “psychologically abused and harassed her,” which she was unaware she was experiencing at the time she executed the agreement because she “was not going to the psychologist yet.” Thus, her claim is essentially that through psychological counseling she received subsequent to the signing of the agreement, she learned she was experiencing psychological or emotional abuse. Regarding her allegation of overreaching, the Wife testified without further elaboration that she believed the Husband had taken advantage of her affection toward him.
The Husband filed a motion for summary judgment regarding the Wife’s affirmative defenses, arguing that as a matter of law the agreement was valid and should control the dissolution action. Attached to the motion was the transcript of the hearing where the agreement was ratified by the trial court. The evidence presented at the hearing on the motion for summary judgment included the depositions of the Wife, her accountant, and her counsel. The trial court granted the Husband’s motion for summary judgment and entered a final judgment for dissolution of marriage, which adopted and ratified the marital settlement agreement. This appeal followed.
On appeal, the Wife relies entirely on Casto v. Casto, 508 So.2d 330 (Fla.1987), to argue that the trial court erred in entering summary judgment. Under Cas-to, there are two alternative grounds by which either spouse may challenge a post-nuptial agreement and have it vacated or modified. Id. at 333.
First, a spouse may set aside or modify an agreement by establishing that it was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching. Masilotti v. Masilotti, 158 Fla. 663, 29 So.2d 872 (1947); Hahn [v. Hahn, 465 So.2d 1352 (Fla. 5th DCA 1985)]; O’Connor [v. O’Connor, 435 So.2d 344 (Fla. 1st DCA 1983) ]. See also Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.1962).
The second ground to vacate a settlement agreement contains multiple elements. Initially, a challenging spouse must establish that the agreement makes unfair or unreasonable provision for that spouse, given the circumstances of the parties. Del Vecchio, 143 So.2d at 20. To establish that an agreement is unreasonable, the challenging spouse must present evidence of the parties’ relative situations, including their respective ages, health, education, and financial status. With this basic information, a trial court may determine that the agreement on its face, does not adequately provide for the challenging spouse and, consequently, is unreasonable. In making this determination, the trial court must find that the agreement is “disproportionate to the means” of the defending spouse. Id. This finding requires some evidence in the record to establish a defending spouse’s financial means. Additional evidence other than the basic financial information may be necessary to establish the unreasonableness of the agreement.
Once the claiming spouse establishes that the agreement is unreasonable, a presumption arises that there was either concealment by the defending spouse or a presumed lack of knowledge by the challenging spouse of the defending spouse’s finances at the time the agreement was reached. The burden then shifts to the defending spouse, who may rebut these presumptions by showing that there was either (a) a full, frank disclosure to the challenging spouse by the defending spouse before the signing of the agreement relative to the value of all the marital property and the income *384 of the parties, or (b) a general and approximate knowledge by the challenging spouse of the character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties. The test in this regard is the adequacy of the challenging spouse’s knowledge at the time of the agreement and whether the challenging spouse is prejudiced by the lack of information. Id,.; see Belcher v. Belcher, 271 So.2d 7 (Fla.1972); Del Vecchio.

Id.

Relying on this passage, the Wife advances two primary arguments. First, the Wife argues that the trial court erred in granting summary judgment because there was evidence of fraud, duress, coercion, misrepresentation, or overreaching. Second, the Wife argues that there was evidence that the agreement made unfair and unreasonable provision for the Wife, leaving her only one-fourth of the marital assets and no alimony after a twenty-eight year marriage. According to the Wife, Casto dictates that once she demonstrated that the agreement was unreasonable, the burden shifted to the Husband to rebut the presumption that he concealed his finances or that the Wife lacked knowledge of the Husband’s finances, which she argues he failed to do. At the very least, the Wife contends the trial court erred by ruling on the validity of the marital settlement agreement without allowing her the benefit of the additional discovery she sought, which she claims would have enabled her to prove that, based on the relative financial positions of the parties during the marriage, the agreement made unfair or unreasonable provision to the Wife. We disagree.
We dispense with the Wife’s discovery argument at the outset. In Carter v. Carter, 3 So.3d 397 (Fla. 4th DCA 2009), the Fourth District established that when a party moves to set aside a marital settlement agreement entered into during the course of litigation on the basis of fraud and misrepresentation, but in so doing pleads these grounds conclusorily and without specificity, it would be a departure from the essential requirements of the law for the trial court to allow discovery prior to ruling on the validity of the marital settlement agreement.
Subsequently, the wife also moved to set aside the settlement agreement, based in part on eonclusory allegations that the husband’s disclosure of his income on his financial affidavit was “fraudulent.” She now takes the position that the discovery previously sought is necessary for her to litigate this motion.
Whether the trial court departed in ordering that discovery is the issue presented by the instant petition. While personal financial information is fully discoverable when relevant to the subject matter of the pending action, it may cause irreparable harm to a person who is forced to disclose it when the information is not relevant.
Under the circumstances of this case, we agree with the husband’s position that he should not be compelled to produce the discovery requested by the wife unless and until the court first determines the validity of the parties’ settlement agreement.
Although in this case the wife claims the agreement was procured by fraud or misrepresentation by the husband, the record before this court does not demonstrate that she pleaded such with specificity.
Unless and until the trial court invalidates the parties’ marital settlement agreement, the husband’s private financial information should remain private.
*385 Id. at 397-98 (internal citations and quotations omitted).
In this case, as in Carter, the Wife attempted to set aside a marital settlement agreement entered into during the course of litigation, but her pleadings were entirely conclusory and lacked specificity. Under these circumstances, the trial court was duty-bound to determine the validity of the marital settlement agreement prior to granting the Wife’s discovery requests. We therefore reject the Wife’s discovery argument.
Additionally, the Wife’s reliance on Cas-to is misplaced. Casto concerned a post-nuptial agreement entered into between a husband and wife who, unlike the Husband and the Wife in this case, were not in the midst of litigation against each other. The rationale underpinning the holding in Cas-to is that a husband and wife in such a situation hold a position of mutual trust and confidence, and, therefore, a trial judge may more carefully scrutinize a marital settlement agreement between an un-estranged husband and wife for fairness. See Casto, 508 So.2d at 334 (“Courts ... must recognize that parties to a marriage are not dealing at arm’s length, and, consequently, trial judges must carefully examine the circumstances to determine the validity of these agreements.”).
Florida case law is clear that Casto does not govern marital settlement agreements entered into during the course of litigation, when the Husband and the Wife are necessarily dealing at arm’s length, and when each party has had ample opportunity to avail himself or herself of Florida’s liberal discovery procedures to unearth the opposing party’s finances. Petracca v. Petracca, 706 So.2d 904, 911-12 (Fla. 4th DCA 1998); see also Kuehera v. Kuehera, 983 So.2d 776, 780 (Fla. 4th DCA 2008); Griffith v. Griffith, 860 So.2d 1069, 1074 (Fla. 1st DCA 2003); Crupi v. Crupi, 784 So.2d 611, 612-13 (Fla. 5th DCA 2001). As the Fourth District held in Petracca:
The adequacy of knowledge can be plausibly raised only when the agreement was reached by marital parties in conditions of mutual trust and confidence and who were, therefore, not dealing at arm’s length. The wife in this case attempts to imply that even when the parties are engaged in contested dissolution of marriage proceedings — when there has been ample opportunity for the party to make use of the procedural rules for discovery of financial resources — a party can still plausibly allege that they were still dealing in mutual trust and confidence and not at arm’s length or from inadequate knowledge of finances.
We are compelled by the supreme court holdings discussed above to reject the wife’s argument. Once the parties are involved in full-fledged litigation over dissolution of property and support rights, they are necessarily dealing at arm’s length and without the special fiduciary relationship of unestranged marital parties. As we noted in Zakoor [v. Zakoor, 240 So.2d 193 (Fla. 4th DCA 1970)], there can be no question of the adequacy of knowledge when an adversarial party has had the opportunity of financial discovery under the applicable rules of procedure. The Casto line of cases, therefore, logically has no application when the challenging spouse has had the benefit of litigation discovery through independently chosen counsel to learn the full nature and extent of the finances of the other spouse. The very purpose of litigation is to unearth the other party’s assets and income. The law quite properly presumes that a litigation settlement made after discovery *386 and just before trial was done with full knowledge by the challenging spouse.
[[Image here]]
... After resorting to litigation over marital property rights, neither party can be thought dealing as fiduciaries or inadequately informed as to financial affairs.
Petracca, 706 So.2d at 911-13 (footnote omitted). The distinction recognized in Petracca holds true even when the agreement entered into during litigation contemplates reconciliation and the underlying dissolution action is subsequently dismissed. See Kuchera, 983 So.2d at 777-80.
It is uncontested that the agreement at issue here was entered into during the course of litigation. Thus, the Wife’s reliance on Casto is misplaced, and the Wife’s second and third affirmative defenses, which were premised entirely on the fairness inquiry in Casto, were deficient as a matter of law.
We turn now to the standard that does govern the present case. To set aside a marital settlement agreement during the course of litigation, “the challenging spouse is ... limited to showing fraud, misrepresentation in the discovery, or coercion.” Petracca, 706 So.2d at 912. As we will demonstrate below, the Wife, as a matter of law, has failed to establish any of these three grounds.
First, the Wife failed to plead the affirmative defense of fraud with even a semblance of particularity, and therefore waived fraud as a defense. See Cocoves v. Campbell, 819 So.2d 910, 913 (Fla. 4th DCA 2002) (“An affirmative defense of fraud that is not pleaded with particularity is deemed waived.”); Blue Supply Corp. v. Novos Electro Mech., Inc., 990 So.2d 1157, 1159-60 (Fla. 3d DCA 2008) (holding that the factual basis for a claim of fraud must be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as time, place or manner in which they were made). In this situation, the vagueness of the Wife’s pleading was understandable, given that the Husband’s counsel demonstrated that every instance of fraud the Wife alleged in her deposition was entirely baseless. Without rehashing the entire testimony, the following excerpt provides a sufficient summary of the Wife’s entire deposition:
Q. Well, you said in your answer to the divorce that the Marital Settlement Agreement was reached under fraud. I want to know every single basis for fraud that you are aware of.
A. I cannot answer with specific details on that, but my attorney is the one that can.
Q. I’m not asking about your lawyers. I’m asking about you. And my question to you is, I want to know every specific document or instance or misrepresentation or omission that would constitute fraud.
A. As far as I know, he omitted or hid information.
[[Image here]]
Q. Well, you have no proof of any assets that he had at the time of the agreement that were not disclosed, do you?
A. If I have any proof?
Q. Yes.
A. No.
It goes without saying that conclusory allegations of fraud are insufficient to survive a motion for summary judgment.
With respect to the second ground, the Wife herself admitted in her deposition that she had no basis for alleging any “misrepresentation in the discovery.”
*387 Q. What facts do you have to show those numbers are wrong?
A. I don’t have any evidence because the accountant has to do the work first to determine it.
Thus, the Wife’s own unrebutted testimony establishes that the Husband was entitled to summary judgment on the Wife’s defense of “misrepresentation in the discovery.”
Lastly, with respect to the third ground, the Wife claims the marital settlement agreement was the product of duress because the Husband slashed her tires three times at unspecified points over the course of their twenty-eight year marriage, slept with a gun underneath the mattress, and at some point called her and stated, “[I]f you don’t sign the agreement I will take care of you.” The Wife, however, failed to establish any nexus between the first two allegations and her signing of the agreement. For instance, the Wife did not testify that the Husband slashed her tires because she did not or would not sign the agreement. Likewise, the Wife did not testify that the Husband threatened her with the gun, or otherwise used it to intimidate her into signing the agreement. Surely, the fact that the Husband exercised his second amendment right to bear arms, standing alone, does not rise to the level of duress. Finally, even if we were to read the Wife’s third duress allegation in the light most favorable to her, i.e., that the Husband meant that he “would take care of her” in a threatening, rather than in a loving way, it would still be insufficient to survive a motion for summary judgment.
Duress “is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition.” Francavilla v. Francavil-la, 969 So.2d 522, 524-25 (Fla. 4th DCA 2007) (emphasis added) (quoting Williams v. Williams, 939 So.2d 1154, 1157 (Fla. 2d DCA 2006)). It is now well settled that “[t]wo factors must be proven to establish duress: ‘(a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side.’ ” Francavilla, 969 So.2d at 525 (emphasis added) (quoting City of Miami v. Kory, 394 So.2d 494, 497 (Fla. 3d DCA 1981)). “Duress involves a ‘dual concept of external pressure and internal surrender or loss of volition in response to outside compulsion.’ ” Francavilla, 969 So.2d at 525. As such, the party claiming duress must establish that the effects of the alleged coercive behavior affected their subjective intent to act.
The Wife has established the opposite in this case. Importantly, during her deposition testimony, the Wife explained that the reason she stated, in open court, that she was entering the agreement freely and voluntarily was that she was not aware of any psychological stress resulting from the above mentioned allegations at the time she executed the agreement, or during her colloquy with the trial court, and that she actually believed she was entering into the agreement freely and voluntarily when she executed the agreement.
Q.... Ms. Parra, I’m a little confused. Because if you say the agreement was reached with duress and coercion, why did you tell the judge that you were entering this agreement freely and voluntarily?
A. Because I believed that at the time I was doing the best that I could do.
Q. Well, I don’t know what that means. You have a judge who is sitting up there, who is listening to see whether *388 she is going to approve this agreement or not, and if you would have said “I’m not entering into this freely, I have been psychologically or emotionally abused, I have changed my mind,” it’s more likely than not the judge would not have signed the order. So why didn’t you say something?
A. I was not aware at the time. At the time I was not going to the psychologist yet."
[[Image here]]
Q. You told the judge that you were entering into this agreement freely and voluntarily, correct?
A. That’s what I thought.
Q. Correct?
A. That’s what I believed.
Q. And not until your husband filed for divorce over two years later do you say, “Oops, no, it’s not a fair agreement,” correct?
A. Yes, because divorce is something completely different.
It follows that if the Wife was unaware of the impact of the Husband’s alleged coercive actions, then their resulting pressures could not have “destroy[ed] the free agency of [the Wife] and cause[d] [her] to ... make a contract not of [her] own volition,” or “free choice or will.” As a result, the Wife has failed to establish the defense of duress.
For these reasons, we affirm the trial court’s entry of summary judgment in favor of the Husband.
Affirmed.