969 So.2d 522 (2007)
Kandice K. FRANCAVILLA, Appellant,
v.
John FRANCAVILLA, Appellee.
No. 4D06-2128.
District Court of Appeal of Florida, Fourth District.
November 21, 2007.
Rehearing Denied December 26, 2007.
*523 Roslyn L. Stevenson of Roslyn L. Stevenson, P.A., Hollywood, for appellant.
Nancy A. Hass of Nancy A. Hass, P.A., Hallandale Beach, for appellee.
GROSS, J.
In a divorce case which the trial court characterized as being "about getting money and keeping money," we address the wife's attacks on a prenuptial agreement and on a ruling that certain real property was not gifted to the wife. We affirm the trial court's judgment enforcing the prenuptial agreement and making equitable distribution according to its terms.
There was much conflicting testimony at trial. The circuit court resolved most conflicts in the husband's favor. The "`findings of the trial court come to this court clothed with a presumption of correctness and will not be disturbed absent a showing that there was no competent evidence to sustain them.'" Waton v. Waton, 887 So.2d 419, 422 (Fla. 4th DCA 2004) (quoting Baker v. Baker, 394 So.2d 465, 468 (Fla. 4th DCA 1981)). We therefore "take the facts most favorably in support of the trial court's decision." Waton, 887 So.2d at 422.
The parties had a choppy relationship. They married twice. The first marriage occurred within weeks of their first meeting in 1982. They moved to Georgia for the husband to attend chiropractic school. The wife left the husband in 1984 "because of the financial burdens of student life."[1] The first marriage ended in divorce.
*524 Three years after the divorce, the couple resumed living together. The wife left the husband again to move in with another man in the same apartment complex.
At the end of 1992, the wife learned from her father where the husband was practicing. She scheduled an appointment with him, complaining of a pinched nerve. They quickly began dating. The wife became pregnant within a month. The couple then contemplated remarriage.
Because of their rocky history, the husband insisted, from the outset of the marriage discussions, that the wife enter into a prenuptial agreement as a "precondition to his marrying her." He told her, "Kandice, you broke my heart twice but you're not going to take my money." The parties negotiated the terms of the agreement for three or four months. The wife retained a lawyer recommended by her close friend. Two months before the marriage, the husband's tax attorney provided the wife with a financial statement and tax returns for the preceding two years; he told the wife to take the documents to her lawyer for his review, but she "took no steps to have the disclosure or the tax returns reviewed by counsel or an accountant." The wife knew that the husband was worth between $1.6 and $2.5 million. The trial judge found that the disclosures "adequately apprised" the wife of the husband's "financial condition at the time of the parties' marriage."
Between themselves, the parties negotiated the amount of alimony and the term over which it would be paid. The wife's attorney prepared the prenuptial agreement ultimately signed by the parties. The wife met with her attorney at least twice to go over the terms of the agreement. Three or four days before the wedding, the wife and the husband negotiated two changes to the agreement, including a cost of living increase as to alimony. Less than an hour after signing the prenuptial agreement, the parties married.
Concerning alimony, regardless of the length of the marriage, the agreement provided that the wife was entitled to
$1,250 per month on the first of each and every month for a period of five (5) years after the youngest child reaches the age of eighteen (18). For example, if a Final Judgment of Dissolution of Marriage was entered one day after the youngest child was born, Wife would be entitled to alimony for twenty-three (23) years at the rate of $1,250 per month payable on the first of each and every month, with an annual cost of living increase until wife remarries. (Handwritten portion of agreement in italics).
As to equitable distribution, the agreement provided that after ten years of marriage the wife would be entitled to 10% of the husband's "total net worth," including both marital and non-marital assets. For each year of marriage beyond ten years, the wife would be entitled to receive an additional 1% of the husband's "total net worth."
The wife first contends that the prenuptial agreement should be set aside because it was the product of duress. A spouse may set aside a prenuptial agreement by "establishing that it was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching." Casto v. Casto, 508 So.2d 330, 333 (Fla.1987).[2] As the wife points out, duress "is a condition of mind produced by an improper external *525 pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." Williams v. Williams, 939 So.2d 1154, 1157 (Fla. 2d DCA 2006) (quoting Herald v. Hardin, 95 Fla. 889, 116 So. 863, 864 (1928)). Two factors must be proven to establish duress: "(a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." City of Miami v. Kory, 394 So.2d 494, 497 (Fla. 3d DCA 1981). Duress involves a "dual concept of external pressure and internal surrender or loss of volition in response to outside compulsion." Id. (citing 17 C.J.S. Contracts, s. 168 at 943 (1963)).
The wife finds duress in the following facts: she was seven months pregnant at the time the agreement was signed, her pregnancy forced her to leave her job as a flight attendant, and the agreement was not signed until an hour before the wedding ceremony.
Focusing on the entire prenuptial negotiations, and not just on the endgame, leads to the conclusion that competent, substantial evidence supports the trial court's decision finding that there was no duress.
The prenuptial negotiations stretched over some months. See Waton, 887 So.2d at 421. The husband properly disclosed the extent of his assets. The husband and wife went back and forth over the terms. The wife used the services of an attorney who drafted the agreement. After the agreement was drafted, the wife negotiated a favorable cost of living increase reflected in the handwritten changes. See Herrera v. Herrera, 895 So.2d 1171, 1175 (Fla. 3d DCA 2005). Other facts softened the coercive effect of the pregnancy on the wife, but we see no reason to air them in a public document. The husband's ultimatum that he would not marry the wife without a prenuptial agreement does not constitute duress because there is nothing improper about taking such a position. See Doig v. Doig, 787 So.2d 100, 102 (Fla. 2d DCA 2001); Eager v. Eager, 696 So.2d 1235, 1236 (Fla. 3d DCA 1997)(where the court wrote that "[i]t is not a threat or duress for the proponent of the agreement to make it clear that there will be no marriage in the absence of the agreement.").
This case lacks the time pressure aspects of cases finding duress like Hjortaas v. McCabe, 656 So.2d 168, 170 (Fla. 2d DCA 1995), where the wife was first presented with a prenuptial agreement two days before the wedding, with no financial disclosure, and she faced the choice of signing the agreement or cancelling the wedding. Here, the parties negotiated the prenuptial agreement for months with attorneys, counterproposals, and fair financial disclosure by the husband. The wife did not first confront a prenuptial agreement with a planned wedding ceremony and reception looming; the couple married at the courthouse, an event that could have been postponed with limited stress if further negotiations were needed. This case presents a less egregious fact pattern for duress than Waton, where we rejected a claim that duress invalidated a prenuptial agreement; Waton pointed out that the wife received the agreement two weeks before the wedding, the husband told the wife about the terms of the agreement before its preparation, and the husband made a list of his assets and showed the list to the wife before contacting a lawyer to draft the agreement. 887 So.2d at 422.
The wife next argues that the prenuptial agreement should be set aside under the second ground in Casto. To prevail *526 on this ground, "the challenging spouse must establish that the [prenuptial] agreement makes an unfair or unreasonable provision for that spouse, given the circumstances of the parties." Casto, 508 So.2d at 333. As the supreme court explained the procedure,
[o]nce the claiming spouse establishes that the agreement is unreasonable, a presumption arises that there was either concealment by the defending spouse or a presumed lack of knowledge by the challenging spouse of the defending spouse's finances at the time the agreement was reached. The burden then shifts to the defending spouse, who may rebut these presumptions by showing that there was either (a) a full, frank disclosure to the challenging spouse by the defending spouse before the signing of the agreement relative to the value of all the marital property[3] and the income of the parties, or (b) a general and approximate knowledge by the challenging spouse of the character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties. The test in this regard is the adequacy of the challenging spouse's knowledge at the time of the agreement and whether the challenging spouse is prejudiced by the lack of information.
Id.
The evidence supports the trial court's ruling that the wife failed to make both showings under the second Casto ground.
First, at the time the prenuptial agreement was made, it did not make an "unfair or unreasonable provision" for the wife, "given the circumstances of the parties." Casto, 508 So.2d at 333. When the agreement was signed in 1993, the wife was 33 and the husband was 31. From the husband's standpoint, this was a high risk marriage; the wife had left him twice before. Nonetheless, the agreement provided for alimony even if the marriage was short. For example, if the marriage dissolved the day after the first child was born, the wife was entitled to 23 years of alimony at $1,250 per month with annual cost of living increases; $1,250 was one half of her monthly salary as a flight attendant. In addition, the wife was entitled to a $25,000 cash payment after the filing of a petition for dissolution of marriage but before she vacated the marital home. The agreement did not address child support, which would be based on the respective incomes of the parties.
In a short term marriage, the agreement favored the wife. Although alimony is usually reserved for longer marriages, the wife was entitled to receive up to 23 years of payments in addition to a cash payment that equaled ten months of her salary, regardless of the length of the marriage. In a short term marriage, it is unlikely that the wife's share of marital assets would have exceeded what she received under the agreement. With the benefit of hindsight, the wife may have realized an equitable distribution that exceeded the payout called for in the prenuptial agreement, because the husband's net worth increased to $5 million from $2.5 million over the ten-year marriage. However, had the husband not prospered, 10 percent of his total assets might have exceeded 50 percent of the couple's marital assets. When measured by the 1993 circumstances of the parties, the prenuptial agreement took into account various risks and made reasonable provisions for the wife.
As to the second Casto showing, the evidence described above supported the *527 finding that the husband fully and frankly disclosed his assets and income prior to the marriage.
The wife next challenges the trial court's determination that the husband did not intend to make a gift to the wife of certain jointly titled real property. The testimony on this issue conflicted. The husband adamantly maintained that no gifts were intended, that he never discussed gifting any real property to the wife, and that he believed that the prenuptial agreement rendered the titling of the property irrelevant to equitable distribution in a divorce proceeding. The husband distinguished the real property from other purchases made during the marriage which he conceded to be gifts. The trial court chose to believe the husband. We cannot overturn this finding based on this record. See Marsh v. Marsh, 419 So.2d 629, 630 (Fla. 1982) (holding that where evidence conflicted as to whether wife intended to make gift of home to husband, "it is the responsibility of the trial court to evaluate the weight and credibility of that testimony and to arrive at a determination"); Cameron v. Cameron, 591 So.2d 275, 276 (Fla. 5th DCA 1991).
Finally, we reject the wife's reading of the agreement that the annual cost of living alimony increase is to be measured from the date of the prenuptial agreement. The agreement describes the filing of a petition for dissolution as the trigger for the entitlement to alimony. The agreement contemplates that the first alimony payment will be $1,250, not $1,250 plus all annual cost of living increases since 1993.
Affirmed.
GUNTHER and WARNER, JJ., concur.
NOTES
[1] In this opinion, the portions of the facts in quotes are from the trial court's findings of fact contained in a partial final judgment issued on February 16, 2005.
[2] Although Casto involved a postnuptial agreement, the case is also "controlling as to pre-nuptial agreements." Waton v. Waton, 887 So.2d 419, 423 n. 1 (Fla. 4th DCA 2004).
[3] As we have pointed out in Footnote 2, Casto applies to prenuptial agreements, where the disclosure required is of premarital property.