# Third District Court of Appeal

## State of Florida

Opinion filed August 31, 2022.

_____

No. 3D19-1884
Lower Tribunal No. 17-258-P

_____

**Paul Evan Bates,**
Appellant,

vs.

**Magda Jhovanna Bates,**
Appellee.

An Appeal from a non-final order from the Circuit Court for Monroe County, Sharon I. Hamilton, Judge.

Ross & Girten, and Lauri Waldman Ross, for appellant.

Law Office of Jack Bridges, P.A., and James R. (Jack) Bridges, for appellee.

Before FERNANDEZ, C.J., and EMAS, LOGUE, SCALES, LINDSEY, HENDON, MILLER, GORDO, LOBREE, and BOKOR, JJ.

<u>ON MOTION FOR REHEARING EN BANC</u>

PER CURIAM.

Paul Evan Bates ("husband") appeals the trial court's non-final order that invalidated the parties' prenuptial agreement in part. A panel of this court affirmed the trial court order in <u>Bates v. Bates</u>, 46 Fla. L. Weekly D287, 2021 WL 358188 (Fla. 3d DCA Feb. 3, 2021). Thereafter, on the husband's motion for rehearing en banc, seven members of this court voted to rehear the matter en banc pursuant to Florida Rule of Appellate Procedure 9.331(d)(1).

Upon en banc consideration, this court is evenly divided concerning disposition of the appeal, with Judges Emas, Logue, Scales, Miller and Lobree voting to deny rehearing en banc and Judges Fernandez, Lindsey, Hendon, Gordo and Bokor voting to grant the motion for rehearing en banc. Accordingly, the motion for rehearing en banc is denied and in accordance with the requirements of Florida Rule of Appellate Procedure 9.331(a), the panel opinion remains the opinion of this court. <u>See</u> Fla. R. App. P. 9.331(a) ("The en banc decision shall be by a majority of the active judges actually participating and voting on the case. In the event of a tie vote, the panel decision of the district court of appeal shall stand as the decision of the court.")

FERNANDEZ, C.J., and EMAS, LOGUE, SCALES, LINDSEY, HENDON, MILLER, GORDO, LOBREE and BOKOR, JJ., concur.

2

LOGUE, J., concurring in denial of rehearing en banc.

The trial court determined that the prenuptial agreement at issue must be set aside as the product of coercion. The panel affirmed over a dissent. The Court sitting en banc has voted to deny the husband's motion for rehearing en banc thereby leaving intact the panel's opinion and affirming the trial judge. I concur in denying rehearing en banc and affirming the trial judge.

Strange as it may seem, the difference between the concurring judges and the dissenting judges boils down to diametrically opposed understanding of the facts. The concurring judges interpret the record as supporting the trial court's express written finding that "the [wife] has shown competent substantial evidence that the execution of the prenuptial agreement on August 31, 2001 is invalid as being the product of duress and coercion." Order Finding Prenuptial Agreement Invalid, Bates v. Bates, No. 2017-DR-258-P at *7, *11 (Fla. 16th Cir. Ct. Sept. 4, 2019). The dissenting judges, on the other hand, interpret the record to reflect the opposite, namely "the wife voluntarily signed the prenuptial agreement." Bates v. Bates, 46 Fla. L. Weekly D287, D291 (Fla. 3d DCA Feb. 3, 2021)

3

(Lindsey, J., dissenting) and "the trial court [found] the wife voluntarily entered into this agreement . . . ." Infra at 39 (Gordo, J., dissenting). If we could agree on the facts, I think we would agree on the result. But our conference is split on how we interpret the factual record.

In this regard, I must respectfully take issue with the dissenting opinions. They make their case somewhat selectively. Their analysis simply does not acknowledge the competent, substantial evidence that supports the trial court's decision. Not only do they overlook the competent, substantial evidence that supports the trial court, they also expressly reweigh the evidence. In doing so, the dissents are driving in a lane reserved for trial judges. When the competent, substantial evidence that supports the trial court is considered, this case presents a textbook model of coercion. This is true under any definition of coercion, including the definition used in the panel decision (which is quoted from Black's Law Dictionary), in this Court's precedent in Ziegler v. Natera, 279 So. 3d 1240, 1243 (Fla. 3d DCA 2019), and in the dissenting opinions themselves. Because the dispute is merely over what competent, substantial evidence in the record should be considered, this case does not warrant en banc review.

4

BACKGROUND

After a sixteen-year marriage that produced five children, the parties filed petitions and counter-petitioners for dissolution of their marriage. During the proceedings, the husband moved to enforce, and the wife moved to set aside, a prenuptial agreement signed sixteen years earlier. That issue was bifurcated and set for an evidentiary hearing. After a four-day evidentiary hearing, the trial court issued the eleven-page order under review which painstakingly reviews the conflicting testimony of the wife and husband.

The dissents acknowledge some facts that emerged at trial, namely that:

- At the time the agreement was signed, the husband was a 41-year-old airline pilot living in the United States and the wife was an 18-year-old living in Colombia;

- The couple became engaged on the day they met and married within 3 months of meeting each other;

- The wife could not speak English and the husband could not speak Spanish;

- The wife testified "I would have signed anything. Anything."

The dissents, however, do not acknowledge or address other facts that emerged at the evidentiary hearing, some of which were admittedly hotly disputed, namely:

5

- In reliance on the plan to marry and immigrate, the wife jeopardized her ties to her strictly religious family by engaging in premarital sex with the husband (although she had previously been a virgin) and getting pregnant as a result;

- The wife terminated the pregnancy at the insistence of the husband two weeks prior to the wedding and was still suffering some pain from the procedure when the husband presented the wife with the prenuptial agreement;

- The husband presented the prenuptial agreement to the wife as an ultimatum two days before the wedding;

- The Colombian lawyer paid by the husband did not provide the wife any legal advice;

- At the instruction of the husband, the Colombian lawyer backdated the prenuptial agreement;

- The husband presented the prenuptial agreement as part of the immigration paperwork;

- In doing so, the wife expressly testified, referring to the prenuptial agreement, "[h]e misrepresented this paperwork, and that's the whole thing here"; and "I wish he would be forthcoming. To say, sign this, this is something you need to come to the United States, I wish he just didn't lie to me."

After reviewing the evidence, the trial court concluded "[a]ll of this shows that Mrs. Bates was indeed persuaded, coerced and under emotional duress when she executed the prenuptial agreement." The order goes on to state that the wife "has shown competent substantial evidence that the execution of the prenuptial agreement on August 31, 2001 is

6

invalid as being the product of duress and coercion." The trial court declared the prenuptial agreement was unenforceable.

The appellate panel affirmed the trial court. A majority of the conference of this Court initially voted to consider the husband's motion for rehearing en banc. On en banc consideration, however, the court divided evenly on whether to grant the motion, thus denying the motion and affirming the trial court's judgment. Fla. R. App. P. 9.331(a).

ANALYSIS

All of the factual findings listed above are directly supported by the wife's testimony, including the facts that the dissents do not acknowledge. No party contends on appeal that the trial court committed reversible error in admitting this evidence into the record. This evidence thus constitutes competent, substantial evidence. This is true regardless of whether we would have credited the wife's testimony had we been sitting as trier-of-fact.

Based on this competent substantial evidence, the question presented is: whether the trial court erred in finding that the prenuptial agreement was the product of coercion when the agreement was obtained by a 41-year-old male airline pilot from a 18-year-old woman based on his course of conduct that included (1) convincing the Colombian lawyer

7

purportedly representing the wife to backdate the documents; (2) misrepresenting that the documents had to be signed as part of the immigration process; and (3) raising the prenuptial agreement when the wife was under great time, medical, and social pressures he largely created.

Under our precedent in Ziegler, 279 So. 3d at 1243, the trial court did not commit reversible error when it found that the wife was "coerced . . . when she executed the prenuptial agreement" and the husband's conduct reflected "clear coercion." In Ziegler, we affirmed the setting aside of a prenuptial agreement that stemmed from a substantially similar at-the-altar immigration ultimatum that "threatened life-altering consequences, by imperiling their shared, long-term plan to begin life anew with their children in the United States." Id.

The dissenting opinions never maintain that this competent, substantial evidence is insufficient to qualify as coercion. Instead, they simply decline to address these facts. Remarkably, the dissents do not acknowledge the specific circumstances that the trial court expressly stated it relied on for its finding of coercion, namely that "[the wife] had given her virginity to [the husband], got pregnant, had an abortion . . . coupled with fact that [she] came from a strict Catholic family that would not condone

8

having sex prior to the wedding day (not to mention . . . abortion)." The dissents do not address the specific circumstances constituting the husband's wrongful act—his essential role in placing extreme temporal, medical, and social pressures on the wife; his conduct in having her purported lawyer backdate the document at his instruction; and his wrongfully stating the prenuptial agreement was necessary to immigrate. Reading the dissents, one would assume these facts were not in the record.

This point raises my core difference with the dissents. As the Supreme Court has admonished many times, "[a]s long as the trial court's findings are supported by competent substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court." Cruz v. State, 320 So. 3d 695, 712 (Fla. 2021) (quotations, citations omitted). It is error for an "appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence from the record on appeal before it." Shaw v. Shaw, 334 So. 2d 13, 16 (Fla. 1976).

The appellate court's competent-substantial-evidence review of a trial court's factual findings is limited to determining whether the evidence

9

supporting the judgment is legally sufficient, not whether it is outweighed by conflicting evidence. It does not matter if the record contains other testimony contradicting the testimony that supports the trial court's factual findings. See, e.g., Jockey Club, Inc. v. Stern, 408 So. 2d 854, 855 (Fla. 3d DCA 1982) (affirming an appeal after a non-jury trial because, "while there was conflicting testimony, there was competent and substantial evidence to support the final judgment entered by the trial court.").

Judge Scott Makar made a helpful analogy in this regard when he observed that, in a competent-substantial-evidence review the focus is only on the evidence that supports the factual findings: evidence that is contrary to or conflicting with the factual findings is left "on the cutting room floor." State, Dep't of Highway Safety & Motor Vehicles v. Wiggins, 151 So. 3d 457, 466 (Fla. 1st DCA 2014), aff'd sub nom. Wiggins v. Fla. Dep't of Highway Safety & Motor Vehicles, 209 So. 3d 1165 (Fla. 2017). Except where the law requires a trial court to make express findings, this deference extends to both express and implied findings of fact. Jarrard v. Jarrard, 157 So. 3d 332, 337 (Fla. 2d DCA 2015) (Altenbernd, J.) ("Those essential findings of fact, both express and implied, are reviewed to assure that they are supported by competent, substantial evidence."); Miccosukee Tribe of Indians v. Lehtinen, 114 So. 3d 329, 331–32 (Fla. 3d DCA 2013)

10

(same). In contravention to these basic appellate principles, the dissents give no consideration to the substantial competent evidence that supports the trial court's finding of coercion.

The dissents also improperly reweigh evidence. An example is the manner in which the dissents re-interpret the import of the wife's testimony where she said, "I would have signed anything. Anything." The trial court interpreted these words as part of the evidence indicating the wife was "desperate" and that the wife was "coerced and under emotional duress when she executed the prenuptial agreement." The dissents interpret these words as indicating "the wife voluntarily signed the prenuptial agreement."

The meaning of the wife's testimony ultimately turns not only on the words themselves, but how she communicated them—tone, inflection, body language, and other signals that are not reflected in a court reporter's transcript. Words can have vastly different meanings depending on the manner in which they are said. For this very reason, of course, factual findings are left to the trier of fact who can look the witness in the eye and hear the witness's spoken voice. S.C. v. State, 224 So. 3d 249, 251-52 (Fla. 3d DCA 2017) (Luck, J.) (noting that appellate courts should be wary of a litigant's attempt to use a cold transcript to second-guess the trial court's interpretation of testimony). Here, the trial court, after looking the

11

wife in the eye, hearing her spoken voice, and observing her demeanor interpreted her words to mean that, when the wife heard the at-the-altar ultimatum, she was, in the trial court's words: "desperate" and "coerced."

In this regard, one dissent maintains the wife had the benefit of "consulting with her own lawyer in Colombia." Infra at 39 (Gordo, J., dissenting). While the husband at trial certainly insisted that this was so, the trial court expressly accepted the testimony of the Colombian lawyer that she was not hired to, and did not, provide legal advice. Order Finding Prenuptial Agreement Invalid, Bates v. Bates, No. 2017-DR-258-P at *8 (Fla. 16th Cir. Ct. Sept. 4, 2019) ("The Court accepts her testimony …. Her job was to have the English version of the prenuptial agreement translated and provide it to Mrs. Bates.").

As an appellate court, we are not free to disregard the trial court's interpretation of the evidence. Under the judicial restraint imposed by the proper form of review, appellate courts are required to affirm a lower tribunal's findings "even though, had we been the trier of fact, we might have reached an opposite conclusion." Amador v. Sch. Bd. of Monroe Cty., 225 So. 3d 853, 858 (Fla. 3d DCA 2017) (quoting Heifetz v. Dep't of Bus. Regulation, Div. of Alcoholic Beverages & Tobacco, 475 So. 2d 1277, 1282 (Fla. 1st DCA 1985)).

On a related point, I think the dissents misinterpret the trial court's statement that "[t]he fact that [the wife] would have signed anything to marry [the husband] <u>appears</u> to benefit [the husband's] argument that the agreement was executed freely and voluntarily." (Emphasis added). The dissents suggest the trial court was making a factual finding that the agreement was voluntarily signed by the wife. This sentence makes no such fact-finding. This sentence serves merely as the transition to a long series of paragraphs where the trial court details the facts and expressly concludes that the wife was "desperate" and "was indeed persuaded, coerced and under emotional duress when she executed the prenuptial agreement."

Finally, the analysis set forth above also causes me to conclude that this matter is not a proper one for en banc consideration. The ability of an entire district court to determine a matter en banc under Rule 9.331 is extremely limited. It is far narrower, for example, than an appellate panel's ability to rehear its own decision under Rule 9.330. The text of rule 9.331 restricts en banc consideration to (1) a decision that conflicts with another decision in the district, or (2) a case or issue of exceptional importance. Fla. R. App. P. 9.331(a).

13

These limitations on en banc review ultimately stem from the Florida Constitution's mandate that district courts decide cases by way of three judge panels. Art. V, §4(a), Fla. Const. ("Three [district] judges shall consider each case and the concurrence of two shall be necessary to a decision."). En banc review is a departure from Art. V, §4(a)'s mandate because it allows decisions by more than three district judges. The justification for this departure stems from a Constitutional anomaly. A district court panel cannot overrule another district court panel, In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. Rules of App. Proc., 416 So. 2d 1127, 1128 (Fla. 1982), while the Supreme Court cannot hear intra-district conflicts, Art. V, § 3(b)(3), Fla. Const. The result is a jurisdictional gap which would block both the Supreme Court and the district court from resolving intra-district conflicts. Properly understood, the en banc rule is designed to fill this narrow jurisdictional gap and only this narrow jurisdictional gap.

Admittedly, en banc review was subsequently modified to include cases or issues of "exceptional" importance. See State v. Petagine, 290 So. 3d 1106, 1112 (Fla. 1st DCA 2020) (Tanenbaum, J. concurring in denial of en banc rehearing and insightfully reviewing these developments). But we should not overlook that "exceptional" means "rare, unusual,

14

uncommon." See B. Garner, Garner's Dictionary of Legal Usage at 338 (2011) (defining "exceptional"). Properly understood, because of the Constitutional mandate that district court decisions be made by three judge panels, the availability of en banc review under either ground remains interstitial and incremental. Under these restrictions, en banc review "is not an institution for monitoring panel decisionmaking in order to correct individual injustices or mistakes," as Judge Tanenbaum insightfully explained. Id. at 1112. "[W]e as a full court cannot override a panel decision simply because a majority of us disagree with it." Id. at 1108 (quotations, citations omitted).

Here, there is no intra-district conflict. Given the substantial competent evidence in the record supporting the trial court's findings of coercion, the trial court's decision is in accordance with Zeigler. Nor is the case itself or any issue within it of exceptional importance because the matter turns narrowly on unique and idiosyncratic facts. Judge Frank Shepherd, a former chief judge of this Court, set the example for the proper consideration of a motion for en banc review in University of Miami v. Wilson, 948 So. 2d 774, 791–92 (Fla. 3d DCA 2006) (Shepherd, J., concurring in denial of en banc rehearing). In that case, Judge Shepherd dissented from the panel decision, but he also concurred in the denial of

15

<u>motion for rehearing en banc</u>. He explained, "[w]hile this case is no doubt of exceptional importance to the parties—almost all cases are—it is not a case of exceptional importance, legally speaking, in this court." <u>Id.</u> at 792. Applying Judge Shepherd's reasoning, I do not believe this case merits en banc review.

     EMAS, MILLER, and LOBREE, JJ., concur.

MILLER, J., concurring in denial of rehearing en banc.

I agree that this decision is not worthy of en banc consideration. Nonetheless, I write separately to clarify that I would also affirm the judgment but for different reasons than those adopted by the panel. See Robertson v. State, 829 So. 2d 901, 906 (Fla. 2002) (quoting Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644 (Fla. 1999)) ("[T]he 'tipsy coachman' doctrine[] allows an appellate court to affirm a trial court that 'reaches the right result, but for the wrong reasons' so long as 'there is any basis which would support the judgment in the record.'").

Here, competent, substantial evidence of record supports the trial court's conclusion that the antenuptial agreement "was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching." Casto v. Casto, 508 So. 2d 330, 333 (Fla. 1987). More specifically, the testimony established that the husband presented the wife with the agreement for the first time on the proverbial eve of the wedding, threatened to cancel the wedding if the document was left unsigned, and, knowing that the wife was not proficient in the English language, induced her to sign the agreement by fraudulently misrepresenting the nature and contents of the document as part of the routine paperwork required in the immigration process, as opposed to a legal disclaimer of future entitlement to support and asset

17

distribution, and then attempted to backdate the document to give the illusion it was furnished earlier.

These factual circumstances, considered in tandem with the other evidence of record discussed at length in the panel opinion, were more than sufficient to support the decision by the trial court. <u>See</u> <u>Bakos v. Bakos</u>, 950 So. 2d 1257, 1259 (Fla. 2d DCA 2007); <u>Ziegler v. Natera</u>, 279 So. 3d 1240, 1243 (Fla. 3d DCA 2019); <u>Hjortaas v. McCabe</u>, 656 So. 2d 168, 170 (Fla. 2d DCA 1995); <u>Paris v. Paris</u>, 412 So. 2d 952, 954 (Fla. 1st DCA 1982); <u>Flaherty v. Flaherty</u>, 128 So. 3d 920, 923 (Fla. 2d DCA 2013); <u>Lutgert v. Lutgert</u>, 338 So. 2d 1111, 1116 (Fla. 2d DCA 1976); <u>see also</u> <u>Garcia v. Soto</u>, 337 So. 3d 355, 363 (Fla. 4th DCA 2022) (Artau, J., dissenting) (alteration in original) (citations omitted) (quoting <u>Bueno v. Workman</u>, 20 So. 3d 993, 998 (Fla. 4th DCA 2009)) ("<u>Bueno</u> explained that 'it would be inappropriate' to 'employ the tipsy coachman rule where [the] lower court [had] not made factual findings on [the fraud] issue[.]' Unlike <u>Bueno</u>—where the lower court had not made any finding of fraud—the trial court here made its factual finding of stalking, but did not recite sufficient facts from the record when it explained its reasoning for the finding of stalking."); <u>Delivorias v. Delivorias</u>, 80 So. 3d 352, 354–55 (Fla. 1st DCA 2011) (distinguishing <u>Bueno</u> and "those cases in which the 'tipsy

18

coachman' doctrine was deemed inapplicable [because] the trial court failed to make findings of fact" on an issue, from cases in which the tipsy coachman doctrine should be applied because a factual finding was made on an issue "and competent substantial evidence in the record supports the result, but the trial court failed to explain its reasoning").  Accordingly, I concur in the denial of rehearing en banc.

EMAS, and LOBREE, JJ., concur.

LINDSEY, J., dissenting.

Following this Court's panel opinion in Bates v. Bates, 46 Fla. L. Weekly D287 (Fla. 3d DCA Feb. 3, 2021), which affirmed the trial court's order invalidating the parties' Prenuptial Agreement, Appellant Paul Evan Bates (the "Husband") moved for rehearing en banc pursuant to Florida Rule of Appellate Procedure 9.331(d). For the reasons set forth below, I respectfully dissent from the denial of the Husband's motion for rehearing en banc.

## I.    REHEARING EN BANC JURISDICTION

The issue before this Court is what is the correct legal standard to be applied in determining whether a prenuptial agreement should be invalidated on the basis that it was entered into as a product of duress or coercion,[1] and based on that standard, whether there is competent

---

[1] I use duress and coercion interchangeably because that is how the terms are consistently used in case law throughout the state and in secondary sources on the subject. See, e.g., Paris v. Paris, 412 So. 2d 952, 954 (Fla. 1st DCA 1982) (finding that the defending spouse's "acts amounted to duress and coercion"); Steven Scott Stephens, 23 Fla. Prac., Fla. Fam. Law § 4:7 ("Marital contracts—Voiding—Duress or coercion") (June 2021 Update). The panel majority never explained the need, beyond affirming the order on appeal, to create two distinct tests for coerced conduct. If coercion is simply a broader form of duress, it would be unnecessary to

substantial evidence to support affirmance. I believe we have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.331(d) because the panel opinion creates an issue of exceptional importance by adopting a new, broader definition of coercion—potentially affecting all categories of contracts—and because consideration is necessary to maintain uniformity in this Court's decisions.[2] I would therefore grant rehearing en banc and substitute the following opinion for the panel opinion in <u>Bates</u>.[3]

## II.   BACKGROUND

As set forth in the order on appeal, it is undisputed that the parties met through a dating service called Latin Connection. The Husband was a

---

apply the traditional test for duress since, under the panel majority's new framework, coercion alone is dispositive as it encompasses all duress. But for the panel majority's adoption of a new separate and distinct definition for coercion, all three panel members agree there would be no basis for affirmance. Further, there would be no basis to grant rehearing en banc. Instead, the panel majority opens a Pandora's Box regarding settled contract law.

[2] The concept of duress and coercion is not limited to the interpretation of prenuptial agreements.

[3] There are no other district court of appeal decisions in Florida adopting a definition of coercion separate and distinct from the definition of duress, much less the broad definition adopted by the majority in the panel decision in this case. Absent contrary authority from the district in which they serve, trial judges across the entire state are now bound by the panel majority opinion. <u>See</u> <u>Pardo v. State</u>, 596 So. 2d 665, 666 (Fla. 1992) ("[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts.").

wealthy, 41-year-old airline pilot. Appellee Magda Jhovanna Bates (the "Wife") had recently turned 18 years of age and was living in Colombia. The parties met in May 2001 and were married three months later, in August 2001, in a civil ceremony performed by a notary. Before the marriage, an English copy of the Prenuptial Agreement was given to the Wife's attorney in Colombia, who had the Agreement translated into Spanish. The parties executed the English and Spanish versions of the Agreement the day before they were legally married. Months later, the couple had a religious marriage ceremony in Colombia.

Some sixteen years later, in May 2017, the Wife filed a verified Petition for dissolution of marriage seeking, among other things, to invalidate the parties' Prenuptial Agreement. According to the Petition:

> The subject Prenuptial Agreement should be abrogated on the grounds that it was effectuated and executed as a result of duress. The Wife did not execute the Agreement voluntarily, and in fact, executed the subject agreement involuntarily, and not as an exercise of her own free will or choice, and that this condition of mind was caused by coercive conduct of the Husband.

In support of her duress argument, the Wife pointed to the timing of execution and her limited understanding of the Agreement. The Wife also

22

alleged, as a separate ground, that the Agreement was inequitable.[4] Following a four-day trial on the validity of the Prenuptial Agreement, the trial court entered an order invalidating the Agreement based solely on duress and coercion. The court did not find that any of the provisions were inequitable or unreasonable, and neither party challenges that finding on appeal.

The trial court recognized that "truth and veracity of the parties is crucial to the decision on the validity of the prenuptial agreement." And importantly, the court found that "[n]either party appeared to be entirely truthful in the testimony before the Court."[5] For instance, although the Wife testified that she went to Latin Connection merely to practice her English, the trial court disagreed, finding that "[i]t was her intention to sign up with the Latin Connection dating service to search for an American husband who was wealthy and who would help her leave Colombia with legal immigration status in the United States."

---

[4] As set forth in Casto v. Casto, 508 So. 2d 330, 333 (Fla. 1987), the unreasonableness or inequity of an agreement is a separate ground involving a different analysis from duress/coercion.

[5] This finding is important because the trial court expressly chose which parts of the testimony of the Husband and the Wife, respectively, to believe and which not.

The court also found that "[t]he legal wedding of the parties was performed at an earlier date so that Magda Bates could begin the immigration process as soon as possible. The follow up formal church wedding in December confirms the purpose of the earlier legal wedding service." Finally, the court accepted the Wife's testimony that "she would have signed anything no matter what was contained in the agreement because she loved Paul. She also wanted to come to the United States and enjoy the attributes that came along with marrying a wealthy established American pilot." The court explicitly found that "[t]he fact that Mrs. Bates would have signed anything to marry Mr. Bates *appears to benefit Mr. Bates' argument that the agreement was executed freely and voluntarily.*" (Emphasis added).

Despite these findings, the court relied on "the disparity of the parties['] bargaining position" and a number of factors solely and exclusively intrinsic to the Wife—such as the proximity between the time of entering into the Prenuptial Agreement and the Wife's having recently reached the age of majority, her limited fluency in the English language, and her lack of business experience—to reach the conclusion that "Mrs. Bates was indeed persuaded, coerced and under emotional duress when she executed the prenuptial agreement." Neither alleged by the Wife nor

24

contained within the trial court's order are allegations or findings of any improper or illegal conduct on the part of the Husband.  See City of Miami v. Kory, 394 So. 2d 494, 498 (Fla. 3d DCA 1981) ("[T]he act supposedly coerced must be caused by some improper or illegal conduct of the defendant.").

On appeal, a unanimous panel agreed there was no competent substantial evidence to support the trial court's conclusion that the Agreement resulted from duress.  However, a two-one majority affirmed the order based on the trial court's finding of coercion, both in reliance on a concurrence to a per curiam affirmance in Gribbin v. Gribbin, 499 So. 2d 858 (Fla. 4th DCA 1986).[6]  The Husband's timely motion for rehearing en banc followed.

### III.    STANDARD OF REVIEW

A trial court's factual findings with respect to the voidability of a marital agreement due to duress and coercion must be supported by competent substantial evidence.  See Ziegler v. Natera, 279 So. 3d 1240,

---

[6] The concurrence in Gribbin relied on State v. Woods, 357 N.E.2d 1059 (Ohio 1976), an Ohio Supreme Court *criminal* case interpreting the meaning of "coercion" in the context of sentence mitigation in a capital case. Because of the criminal context, the Ohio Supreme Court interpreted coercion broadly in favor of the accused. See Woods, 357 N.E.2d at 1065 ("This language must be strictly construed against the state and liberally construed in favor of the accused.").

25

1242 (Fla. 3d DCA 2019).  Whether the trial court applied the correct legal standard is a question of law and is therefore reviewed de novo.  See, e.g., Beal v. Beal, 146 So. 3d 153, 154 (Fla. 5th DCA 2014).

## IV.    ANALYSIS

It is well-settled in Florida that parties contemplating marriage may settle their property rights by a nuptial agreement.  See, e.g., Del Vecchio v. Del Vecchio, 143 So. 2d 17, 19 (Fla. 1962); see also § 61.079, Fla. Stat. (2022) (substantially codifying the Uniform Premarital Agreement Act and permitting parties to contract with respect to a broad range of matters).[7] Further, "a court may not deviate from the terms of a voluntary contract either to achieve what it might think is a more appropriate result or 'to relieve one of the parties from the apparent hardship of an improvident

---

[7] The modern trend of treating prenuptial agreements as legally binding contracts enforced using general principles of contract law was precipitated by the Florida Supreme Court's recognition that "the change in public policy towards divorce requires a change in the rule respecting antenuptial agreements settling alimony and property rights of the parties upon divorce . . . ."  Posner v. Posner, 257 So. 2d 530, 532 (Fla. 1972); see also Lashkajani v. Lashkajani, 911 So. 2d 1154, 1158 (Fla. 2005) ("Valid prenuptial agreements regarding post-dissolution support are contracts."). Previously, the Court had taken the position that prenuptial agreements were against public policy. See, e.g., Gallemore v. Gallemore, 114 So. 371, 372 (Fla. 1927) ("The law is well settled that contracts intended to facilitate or promote the procurement of a divorce will be declared illegal as contrary to public policy."). In addition, in 2007, the Florida Legislature adopted the Uniform Premarital Agreement Act, which explicitly permits premarital agreements between prospective spouses. See § 61.079, Fla. Stat. (2022).

bargain,' . . . ." McCutcheon v. Tracy, 928 So. 2d 364, 364 (Fla. 3d DCA 2006) (quoting Beach Resort Hotel Corp. v. Wieder, 79 So. 2d 659, 663 (Fla. 1955)).  In short, "*[t]he general rule is that competent parties shall have the utmost liberty of contracting and their agreements voluntarily and fairly made will be upheld and sustained by the courts. All parties sui juris are free to make whatever contract they may choose so long as no fraud or deception is practiced and there is no infraction of law.  The fact that one of the parties to a contract made a hard bargain will not alone avoid a contract.*"  Petracca v. Petracca, 706 So. 2d 904, 911 (Fla. 4th DCA 1998) (quoting Pierce v. Isaac, 184 So. 509, 513 (Fla. 1938)).

There are "two ways an otherwise enforceable nuptial agreement may be held invalid."  Lashkajani v. Lashkajani, 911 So. 2d 1154, 1157 (Fla. 2005) (citing Casto v. Casto, 508 So. 2d 330, 333 (Fla. 1987)); see also § 61.079(7)(a) (setting forth grounds under which a premarital agreement is not enforceable).  "First, a spouse may set aside or modify an agreement by establishing that it was reached under fraud, deceit, duress, coercion, misrepresentation, or overreaching."  Casto, 508 So. 2d at 333 (citations omitted).  The second, separate ground is that the agreement is unfair or unreasonable *and* resulted from either concealment or nondisclosure of finances.  Id.

27

Since the trial court invalidated the Agreement based solely on duress and coercion, Casto's test for unreasonableness is inapplicable here. However, we must address both grounds—duress/coercion and unreasonableness—because the trial court conflated the test for unreasonableness and the test for duress/coercion in its analysis.

Duress, applicable here, requires some improper or illegal conduct on the part of the party seeking to enforce the agreement. See Parra de Rey v. Rey, 114 So. 3d 371, 387 (Fla. 3d DCA 2013) ("Duress 'is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract *not of his own volition.*'" (quoting Francavilla v. Francavilla, 969 So. 2d 522, 524–25 (Fla. 4th DCA 2007))).

In other words, there must be an improper threat or act that causes a loss of volition. See Woodruff v. TRG-Harbour House, Ltd., 967 So. 2d 248, 250 (Fla. 3d DCA 2007) ("To state a cause of action for duress, a plaintiff must demonstrate '(1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) *that said circumstances were the result of coercive acts of the opposite party.*'" (emphasis added) (quoting McLaughlin v. Fla., Dep't of Natural Res., 526 So. 2d 934, 936 (Fla. 1st DCA 1988))); Restatement (Second) of

28

Contracts § 175 (Am. Law. Inst. 1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.").

The second ground outlined in Casto, unreasonableness, involves multiple elements. "Initially, the challenging spouse must establish that the agreement makes an unfair or unreasonable provision for that spouse, given *the circumstances of the parties.* To establish that an agreement is unreasonable, the challenging spouse must present evidence of the parties' relative situations, including their respective ages, health, education, and financial status." Casto, 508 So. 2d at 333 (emphasis added) (citation omitted). Once the challenging spouse establishes unreasonableness, a presumption arises that there was concealment or nondisclosure of finances, and the burden shifts to the defending spouse to rebut this presumption. Id.

Here, the trial court made no findings that any of the provisions of the Agreement were unreasonable. And, although the trial court invalidated the parties' Agreement based on duress, Casto's first ground, it framed its

29

analysis around an incomplete version of <u>Casto's</u> unreasonableness ground.[8]  This was error.

Instead of determining whether there was an improper threat or act on the part of the Husband causing a loss of volition, the trial court focused extensively on the parties' relative situations.  Indeed, the trial court heavily relied on the disparity of the parties' bargaining positions despite the Wife's testimony[9] that she signed the Agreement, not because she was coerced

---

[8] To invalidate an agreement based on unreasonableness, the challenging spouse must first establish that the agreement contains an unfair or unreasonable provision. <u>Casto</u>, 508 So. 2d at 333. Here, the trial court did not find that any of the provisions were unfair or unreasonable. Moreover, unreasonableness alone is insufficient to invalidate a nuptial agreement. <u>See</u> <u>id.</u> at 334; <u>see also</u> <u>Petracca</u>, 706 So. 2d at 907 ("It is not that all unfair prenuptial agreements are against public policy. Instead, the court has held that only those unfair agreements reached without sufficient knowledge of assets are against public policy."); Steven Scott Stephens, <u>23 Fla. Prac., Florida Family Law</u> § 4:5 (explaining that substantive unfairness, which is not a free-standing basis for voiding a contract, is pertinent under <u>Casto</u> as it triggers a presumption that the agreement resulted from concealment or nondisclosure of financial information).

[9] The Wife's testimony was as follows:

> [COUNSEL FOR THE HUSBAND:] You didn't care what was on this agreement anyway, you would have signed anything because you loved him; correct?
>
> [THE WIFE:] I would sign anything. Anything.
>
> Q. Anything?

by an improper threat or act, but because she would do anything to marry the Husband:

> The fact that Mrs. Bates would have signed anything to marry Mr. Bates appears to benefit Mr. Bates' argument that the agreement was executed freely and voluntarily. However, it can conversely be used to show the disparity of the parties['] bargaining positions.

The trial court further relied on a number of factors solely and exclusively intrinsic to the Wife—such as the proximity between the time of entering into the Prenuptial Agreement and the Wife's having reached the

---

A. Let me finish. I would have signed anything that he would have asked me to sign.

Q. Anything at all? It wouldn't have mattered what this agreement said? It could have said you don't get anything, you don't get a dime, you don't get to be married in the Catholic Church, you don't get anything for your medical education, you don't get anything for alimony, you don't get anything, goodbye, here's a -- good luck, leave, you would have signed that; right?

A. If he had asked me to sign it, yes. I would have signed it.

Q. Okay.

A. Because I trust him very much and I love him very much.

age of majority,[10] her limited fluency in the English language, and her lack of business experience—to reach the conclusion that "Mrs. Bates was indeed persuaded, coerced and under emotional duress when she executed the prenuptial agreement."

The trial court relied on several other unique and personal factors solely and exclusively intrinsic to the Wife and her family, such as their religious beliefs and opinions with respect to the Wife's virginity to bolster that conclusion.[11] This too was error. Absent a finding of an improper threat or some coercive conduct on the part of the Husband, these factors do not come into play.

We recently explained in Ziegler that "[i]n order to prove duress, '[i]t must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was **caused by** *some improper and coercive conduct*

---

[10] It is general knowledge that the age of majority in Florida is 18. At age 18, persons may enter into legally binding contracts, vote, run for public office, be criminally indicted and sentenced to death, and join the armed forces. Yet here, the trial court limited the Wife's capacity to enter into a legally binding contract due to her age even though she had reached the age of majority, both before she met the Husband and before she signed the Prenuptial Agreement.

[11] None of these factors were mentioned in the Wife's Petition as evidence of duress or coercion.

of the opposite side.'"  See Ziegler, 279 So. 3d at 1242 (emphasis added) (quoting Kory, 394 So. 2d 494, 497 (Fla. 3d DCA 1981)).  In short, absent an improper threat or coercive act, there can be no duress.

Here, with respect to the Husband's conduct, the trial court concluded that "[t]he demand to sign the translated prenuptial agreement the day before the wedding or the consequences would be no wedding and no immigration; is clear coercion."  But it is well-established that "it is not improper and therefore not duress to threaten what one has a legal right to do."  Kory, 394 So. 2d at 498 (citations omitted).  And this includes one's legal right to call off a marriage.  See Ziegler, 279 So. 3d at 1243 ("It is not . . . duress for the proponent of the agreement to make it clear that there will be no marriage in the absence of the agreement." (omission in original) (quoting Eager v. Eager, 696 So. 2d 1235, 1236 (Fla. 3d DCA 1997))).

In Ziegler, for example, the improper threat or act on the part of the husband that gave rise to our invalidation of the agreement involved the husband's failure to provide the wife with financial disclosure despite assurances that he would do so:

> Here, the testimony established that the husband initially presented his pregnant wife with the disputed document six days before the wedding. At that time, *the wife requested he produce evidence regarding his holdings and net worth. The husband*

33

*assured the wife such evidence would be forthcoming.*

*In lieu of honoring his pledge, the day before the wedding, the husband demanded execution, with the added ultimatum* of "[n]o agreement, no wedding." [Lutgert v. Lutgert, 338 So. 2d 1111, 1116 (Fla. 2d DCA 1976)]. He further threatened life-altering consequences, by imperiling their shared, long-term plan to begin life anew with their children in the United States. We conclude that these circumstances, unrebutted by the husband, are sufficient to support a finding of duress.

Id. (emphasis added).[12]

The basis for invalidating the prenuptial agreement in Ziegler did not rely solely on the husband's ultimatum the day before the wedding that, without the wife's signature, there would be no wedding. It was the ultimatum *in addition to the husband's failure to provide full financial disclosure* that constituted the improper threat or act.[13] Once it was

---

[12] As explained above, threatening to call off a planned wedding is not an improper threat. See Francavilla, 969 So. 2d at 525 (Fla. 4th DCA 2007) ("The husband's ultimatum that he would not marry the wife without a prenuptial agreement does not constitute duress because there is nothing improper about taking such a position."). While the ability to *immediately* and legally immigrate to the United States can be thwarted by the cancellation of a marriage to a United States citizen, such marriage was not found to be the sole path to the Wife's ability to legally immigrate to the United States.

[13] In some cases, circumstances involving timing have been held to support a finding of duress. See Hjortaas v. McCabe, 656 So. 2d 168, 170

established that there was an improper act in <u>Ziegler</u>, this Court properly considered the second part of the analysis, which involved looking at coercive circumstances giving rise to the wife's loss of volution, such as the fact that she already had one young child with the husband and was pregnant with another.  See <u>Ziegler</u>, 279 So. 3d at 1243.

Here, by contrast, there was no allegation by the Wife, nor any finding by the trial court, of any improper threats or acts on the part of the Husband apart from his ultimatum to sign the Agreement or there would be no marriage.[14]  Further, there is no evidence to support a finding that the

_____

(Fla. 2d DCA 1995) ("[T]he timing of the signing of the document indicates that [the wife's] signature was the product of duress."). Here, however, the record does not support a finding of duress because the trial court expressly found that "[t]he legal wedding of the parties was performed at an earlier date so that Magda Bates could begin the immigration process as soon as possible. The follow up formal church wedding in December confirms the purpose of the earlier legal wedding service." The court further found that it was the Wife who "had already scheduled an appointment with immigration set for a date shortly after the legal wedding." Thus, the time pressure in this case was caused by the Wife, not the Husband, who requested an earlier civil ceremony months before a formal church wedding to expedite her immigration process.

[14]  In fact, there are no allegations that the Husband had anything to do with the factors the trial court relied on to invalidate the Agreement. There are no allegations that he forced the Wife to have premarital sex or told her that he would not marry her unless she did. There are no allegations that the Husband threatened to tell the Wife's parents or her priest about the premarital sex if she did not sign the Prenuptial Agreement. And there are no allegations that the Husband failed to make adequate financial

35

Husband improperly withheld financial documents and demanded execution of the Agreement. Because there is *no evidence*—much less competent substantial evidence—to support a finding that the Husband made an improper threat or otherwise engaged in coercive behavior, we need not wade into the conflicting evidence of the Wife's loss of volition.

## V. CONCLUSION

Given the trial court's error in relying solely on factors relevant to the Wife's internal loss of volition without a finding of any improper threat or act on the part of the Husband, I would reverse. Moreover, I would conclude there was no evidence of an improper threat or act below. Absent any evidence of an improper threat or act on the part of the husband, there is certainly no competent substantial evidence to support an affirmance. Accordingly, "[t]aking, as we are required to do, the facts most favorably in support of the trial court's decision, [Waton v. Waton, 887 So. 2d 419, 422 (Fla. 4th DCA 2004)]," I would conclude "there is not competent, substantial

disclosures. And because the trial court expressly chose to believe and disbelieve certain parts of the testimony of each spouse, we are not free to reweigh the trial court's findings or to chose to rely on testimony or evidence outside the scope of the trial court's express findings. Doing so would constitute fact-finding, which is outside the parameters of the role of an appellate judge. See Farneth v. State, 945 So. 2d 614, 617 (Fla. 2d DCA 2006) ("A fundamental principle of appellate procedure is that an appellate court is not empowered to make findings of fact.").

36

evidence to support the trial court's determination that the parties' prenuptial agreement was the product of duress . . . ." <u>See</u> <u>Bates</u>, 46 Fla. L. Weekly at D291.

FERNANDEZ, C.J., and HENDON, GORDO, and BOKOR, JJ., concur.

GORDO, J., dissenting on denial of rehearing en banc.

I concur in Judge Lindsey's dissental and write separately to emphasize this case is of exceptional importance and merits en banc consideration based on two points: (1) the damaging expansion of judicial arbitrariness over contractual rights based on what a particular jurist views as the disparity of the parties' bargaining positions; and (2) the underlying notion that anytime a contract at issue may have collateral immigration consequences, it must be the product of coercion.

## I. Disparity of the Parties

The majority's stark departure from well-established contract law eviscerates the right to contract and the expectation of the enforceability of contracts. These concepts are fundamentally damaged if every time a contract at issue is subject to being voided based on a court's subjective view of the parties' bargaining positions. It is black letter Florida law that courts shall enforce contracts knowingly and voluntarily entered into, even where the parties are in different bargaining positions. See Windham v. Windham, 11 So. 2d 797, 798 (Fla. 1943) ("We cannot under the law

38

rewrite a contract between parties or interfere with the freedom of contract or substitute our judgment for that of the parties when an apparent improvident bargain has been entered into."); Tasty Box Lunch Co. v. Kennedy, 121 So. 2d 52, 54 (Fla. 3d DCA 1960) ("To hold [an] agreement is unenforceable because the bargaining parties were not on equal terms would void nearly all such agreements . . . ."); Ferguson v. Ferguson, 54 So. 3d 553, 554 (Fla. 3d DCA 2011) ("[T]he bedrock principle of contract law—applicable as well to marital settlement agreements—[is] that bad deals are as enforceable in the law as good deals."). This well-established law is undermined by the majority opinion which conflates its subjective view of the wife's bargaining position with coercion[15], despite the trial court finding the wife voluntarily entered into this agreement after consulting with her own lawyer in Colombia who had translated and discussed the agreement with her. [16]

---

[15] To support its subjective view, the majority explicitly equates a lesser bargaining position with that of a virgin, young adult woman, from a strict Catholic family, who thereafter engages in premarital sex, becomes pregnant, seeks an abortion, paid by her future husband and who desired to come to the United States. Such use of these factors and life experiences as a basis to support coercion necessarily and improperly questions the power and right of this young adult to contract based on the majority's judicial arbitrariness.

[16] At the time the wife signed the prenuptial agreement, she was enrolled in medical school in Colombia. With respect to the parties' bargaining and negotiation of the prenuptial agreement, the husband testified the wife

39

The Concurrence asserts the disagreement between the judges is merely a "diametrically opposed understanding of the facts"— NOT SO. This is a fundamental disagreement over the application of well-settled contractual law. Simply put, no court in this state has ever set aside or voided a contractual agreement that was found to be voluntarily entered into solely because it concluded coercion occurred based on the disparity of the parties' bargaining positions.

Floridians have a basic right to contract and the right to seek to enforce those contracts that are legally created in an effort to secure their own destiny. See Chiles v. United Faculty of Fla., 615 So. 2d 671, 673 (Fla. 1993) ("The right to contract is one of the most sacrosanct rights guaranteed by our fundamental law."); Lugassy v. Lugassy, 298 So. 3d 657, 659 (Fla. 4th DCA 2020) ("The right to make contracts . . . is both a liberty and property right and is within the protection of the guaranties against the taking of liberty or property without due process of law." (quoting Miles v. City of Edgewater Police Dep't/Preferred Governmental

---

negotiated to have it "[a]ll customized [to] what she wanted. She wanted education. She wanted me to put her through medical school . . . ." Although the trial court "discount[ed]" any testimony that negotiation occurred, the prenuptial agreement guaranteed the husband would pay for the wife's full medical school education in the United States once married; and in the event of a divorce, he would pay her six thousand dollars towards her tuition and that sum would be paid, even if she ultimately decided not to attend medical school.

40

Claims Sols., 190 So. 3d 171, 182 (Fla. 1st DCA 2016))). In my view, courts do not have the power to rewrite or strike such contracts, even when they do not like them. The majority's adopted and expanded definition of coercion thus, unequivocally damages Florida contract law and has an ominous impact on the predictability of contract enforcement within our state.

## II. Collateral Immigration Consequences do not Equal Coercion

The majority's opinion further encourages the nullification of all future prenuptial agreements whenever a US citizen potential spouse expresses to the non-citizen potential spouse that failure to sign such an agreement would frustrate the non-citizen's imminent plan to immigrate to the United States.

To start with, it is well-established that a party's discussions prior to a prenuptial agreement in expressing that failure to sign such agreement would result in no marriage, cannot constitute duress or coercion. See Francavilla v. Francavilla, 969 So. 2d 522, 525 (Fla. 4th DCA 2007) ("The husband's ultimatum that he would not marry the wife without a prenuptial agreement does not constitute duress because there is nothing improper about taking such a position."). In other words, the potential husband has every right to decline to marry the potential wife if she does not agree to

41

sign a prenuptial agreement and such an ultimatum is not duress or coercion. See id. "To hold otherwise would effectively provide a per se basis to invalidate most, if not all, antenuptial property agreements." Eager v. Eager, 696 So. 2d 1235, 1236 (Fla. 3d DCA 1997).

Although this legal principle is clear, the majority and Concurrence posit this case is identical to Ziegler v. Natera, 279 So. 3d 1240, 1243 (Fla. 3d DCA 2019), to support the proposition that it is clear coercion to have an immigration ultimatum as part of the parties' discussions of whether to contract. This is clearly contrary to the well-settled principle that a prenuptial ultimatum is permissible. The idea that a voluntarily entered into prenuptial agreement would be invalidated based on coercion solely because one party would not enter into it and the other party would not receive immigration status it is otherwise not entitled to is untenable.

Here, even after the wife married the husband, she was not legally entitled to petition for her own immigration status based on her marriage. That right is reserved solely for the US petitioning spouse. The Immigration and Nationality Act ("INA") provides that "any citizen of the United States claiming that an alien is entitled to . . . an immediate relative status . . . may file a petition with the Attorney General for such classification." 8 U.S.C. § 1154(a)(1)(A)(i). The term "immediate relative" as used in that provision

42

includes "spouses . . . of a citizen of the United States." 8 U.S.C. § 1151(b)(2)(A)(i). For a spouse to obtain immediate relative status, a US citizen petitioner must file a Form I–130 Petition for Alien Relative on behalf of their non-citizen spouse. See 8 C.F.R. § 204.1(a)(1). When a US citizen wants to marry a non-citizen and petition for immigration status based on that marriage, the US citizen submits the petition—not the non-citizen.

Under the majority's reasoning, anytime a US citizen wishes to marry a non-citizen with a prenuptial agreement in place, courts will be able to void the agreement as a product of coercion, despite the non-citizen spouse pushing for an accelerated immigration process and having knowingly and voluntarily signed the agreement with their own independent counsel. This expanded application and new definition of coercion in contract law is in my view legally flawed and violates well-established precedent.

Finally, I view the Concurrence's reliance on the tipsy coachman doctrine as inapplicable to this case. "Sitting as an appellate court, we are precluded from making factual findings ourselves in the first instance." Featured Properties, LLC v. BLKY, LLC, 65 So. 3d 135, 137 (Fla. 1st DCA 2011) (quoting Douglass v. Buford, 9 So. 3d 636, 637 (Fla. 1st DCA 2009)). There are no findings in the order on appeal that the Husband fraudulently misrepresented the nature and content of the agreement as part of the

43

routine paperwork required in the immigration process.[17]  In fact, the trial court found that even the wife's account supported the husband's position that the agreement was voluntarily entered into.  Consequently, this cannot form the basis for a tipsy coachman affirmance.  See BLKY, LLC, 65 So. 3d at 137 ("[W]e 'cannot employ the tipsy coachman rule where a lower court has not made factual findings on an issue and it would be inappropriate for an appellate court to do so.'"  (quoting Bueno v. Workman, 20 So. 3d 993, 998 (Fla. 4th DCA 2009))).

I therefore, respectfully dissent.

FERNANDEZ, C.J., concurs.

---

[17] See Order on Appeal.

44